**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 19, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

_____

STEVEN WAYNE FISH; DONNA
BUCCI; CHARLES STRICKER;
THOMAS J. BOYNTON; DOUGLAS
HUTCHINSON; LEAGUE OF WOMEN
VOTERS OF KANSAS,

      Plaintiffs - Appellees,

v.

KRIS W. KOBACH, in his official
capacity as Secretary of State for the State
of Kansas,

      Defendant - Appellant,

and

NICK JORDAN,

      Defendant.
_____

ENGLISH FIRST FOUNDATION;
ENGLISH FIRST; U.S. JUSTICE
FOUNDATION; PUBLIC ADVOCATE
OF THE UNITED STATES; GUN
OWNERS FOUNDATION; GUN
OWNERS OF AMERICA;
CONSERVATIVE LEGAL DEFENSE
AND EDUCATION FUND; U.S.
BORDER CONTROL FOUNDATION;
POLICY ANALYSIS CENTER; and
COMMON CAUSE,

      Amici Curiae.

No. 16-3147

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:16-CV-02105-JAR-JPO)**

Dale Ho (Rodkangyil Orion Danjuma and Sophia Lin Lakin, American Civil Liberties Union Foundation, Inc., New York, New York; Stephen Douglas Bonney, ACLU of Kansas and Western Missouri, Overland Park, Kansas; Neil A. Steiner and Rebecca Kahan Waldman, Dechert LLP, New York, New York; Angela M. Liu, Dechert LLP, Chicago, Illinois, with him on the briefs), American Civil Liberties Union, New York, New York for Plaintiffs-Appellees.

Kris W. Kobach, Secretary of State of Kansas (Garrett R. Roe, Kansas Secretary of State's Office, Topeka, Kansas, with him on the brief), Kansas Secretary of State's Office, Topeka, Kansas, for Defendant-Appellant.

Herbert W. Titus of William J. Olson, P.C. (William J. Olson, Jeremiah L. Morgan, John S. Miles, and Robert J. Olson, William J. Olson, P.C., Vienna, Virginia; Marc A. Powell, Powell Law Office, Wichita, Kansas; Michael Connelly, U.S. Justice Foundation, Ramona, California, with him on the brief), filed an amicus curiae brief for the English First Foundation, English First, the U.S. Justice Foundation, Public Advocate of the United States, the Gun Owners Foundation, the Gun Owners of America, the Conservative Legal Defense and Education Fund, the U.S. Border Control Foundation, and the Policy Analysis Center, in support of Defendant-Appellant.

Debo P. Adegbile of Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York (Jason D. Hirsch, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Joshua M. Koppel, Tyeesha Dixon, and Derek A. Woodman, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, District of Columbia, with him on the brief), filed an amicus curiae brief for Common Cause in support of Plaintiffs-Appellees.

Before **BRISCOE**, **HOLMES**, and **McHUGH** Circuit Judges.

**HOLMES**, Circuit Judge.

2

## INTRODUCTION

In this case, we must resolve whether section 5 of the National Voter Registration Act (the "NVRA"), 52 U.S.C. § 20504, preempts a Kansas law requiring documentary proof of citizenship ("DPOC") for voter registration, Kan. Stat. Ann. § 25-2309(*l*), as applied to the federally mandated voter-registration form that must be a part of any application to obtain or renew a driver's license (the "motor voter" process).[1] Section 5 of the NVRA mandates that states include a voter-registration form as part of the application for a driver's license, and provides that this voter-registration form "may require only the minimum amount of information necessary to"[2] prevent duplicate registrations and to "enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."[3] 52 U.S.C.

---

[1] We refer to the sections of the NVRA as they appear in Pub. Law No. 103-31, 107 Stat. 77, 77–89 (1993) (codified as amended at 52 U.S.C. §§ 20501–20511), but, naturally, cite to the U.S. Code. The relevant sections of the U.S. Code beginning at § 20501 of Title 52 are each numbered one lower than the corresponding sections of the NVRA, when considering only the final two digits of the U.S. Code sections. *Compare, e.g.*, NVRA § 12, 107 Stat. at 88, *with* 52 U.S.C. § 20511. It should also be noted that while the NVRA was originally codified in Title 42, §§ 1973gg to 1973gg-10, *see* Pub. Law No. 103-31, 107 Stat. 77, it has since been editorially reclassified with other voting and election provisions from titles 2 and 42 into Title 52, effective September 1, 2014. *See Shelby Cty. v. Lynch*, 799 F.3d 1173, 1178 n.1 (D.C. Cir. 2015); *Editorial Reclassification: Title 52, United States Code*, OFFICE L. REVISION COUNSEL, http://uscode.house.gov/editorialreclassification/t52/index.html (last visited Sept. 13, 2016).

[2] As a convenient shorthand, we frequently refer to the principle established by this language as the "minimum-information principle."

[3] Section 5, subparagraph (c)(2)(B)(ii) ("to assess the eligibility of the applicant and to administer voter registration and other parts of the election process"), is

3

§ 20504(c)(2)(B). Section 5 further mandates that motor voter forms include the following: a statement of the criteria for eligibility, "including citizenship"; an attestation that the applicant meets those criteria; and the applicant's signature "under penalty of perjury." § 20504(c)(2)(C).[4]

Granting a motion for a preliminary injunction against enforcement of Kansas's DPOC requirements, the U.S. District Court for the District of Kansas held that the Plaintiffs-Appellees had made a strong showing that Kansas's DPOC law was preempted by NVRA section 5, insofar as DPOC was more than the "minimum amount of information necessary" to achieve the purposes set forth by the statute. Defendant-Appellant Kansas Secretary of State Kris Kobach appeals from the district court's entry of the preliminary injunction, which required him to register to vote any applicants previously unable to produce DPOC and to cease enforcement of Kansas's DPOC requirement with respect to individuals who apply to register to vote at the Kansas Department of Motor Vehicles ("DMV") through the motor voter process.

Exercising jurisdiction pursuant to 28 U.S.C. § 1292,[5] we hold that the district

_____

integral to the NVRA's minimum-information principle. As a shorthand for this lengthy statutory language, we use "eligibility-assessment and registration duties."

    [4]    We frequently refer to these statutory requirements, collectively, as the "attestation requirement." The penalty-of-perjury component is an essential feature of this requirement, putting motor voter applicants on notice that false attestations may carry serious criminal consequences.

    [5]    Secretary Kobach argued in earlier motions practice before this court that the Plaintiffs-Appellees would have lacked standing but for the fact that they chose not to comply with the Kansas DPOC requirements while being able to do so. Def.-Aplt.'s

4

court did not abuse its discretion in granting the preliminary injunction because the NVRA preempts Kansas's DPOC law as enforced against those applying to vote while obtaining or renewing a driver's license. Specifically, section 5 of the NVRA provides, as most relevant here, that the state motor voter form "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20504(c)(2)(B)(ii). Section 5 also requires motor voter forms to include a signed attestation under penalty of perjury that the applicant meets the state's eligibility criteria, including citizenship. § 20504(c)(2)(C). We hold that this attestation under penalty of perjury is the *presumptive* minimum amount of information necessary for state election officials to carry out their eligibility-assessment and registration duties. As it pertains to the citizenship requirement, the presumption ordinarily can be rebutted (i.e., overcome) only by a factual showing that substantial numbers of noncitizens have successfully registered to vote under the NVRA's attestation

Resp. to Pls.-Aplees.' Mot. Correct Appellate R. & Strike Extra-R. Materials from App. 7–10. He claimed that because they had the ability to comply but did not, their injury was self-inflicted and so could not provide standing. *Id.* at 8–9. Secretary Kobach raises essentially the same argument in his merits brief, but this time with regard to irreparable harm, again characterizing the Plaintiffs-Appellants as having inflicted the harm on themselves. This argument is without merit for the reasons we will address below. *See* Discussion *infra* Section II.D (analyzing the irreparable-harm prong of the preliminary injunction standard). Standing requires that plaintiffs have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, — U.S. —, 136 S. Ct. 1540, 1547 (2016). We are confident on the current record that Plaintiffs-Appellees have standing to sue.

requirement. Having determined that Secretary Kobach has failed to make this showing, we conclude that the DPOC required by Kansas law is more than the minimum amount of information necessary and, therefore, is preempted by the NVRA. We **affirm** the grant of a preliminary injunction.

## I. BACKGROUND

### A. Kansas's DPOC Requirement and Prior Litigation

Unremarkably, in Kansas, only citizens may vote in state and federal elections. KAN. CONST. art. V, § 1. The Kansas Constitution also requires the legislature to "provide by law for proper proofs of the right to suffrage." *Id.* art. V, § 4. Kansas adopted its DPOC requirement for voter registration on April 18, 2011. Secure and Fair Elections ("SAFE") Act, ch. 56, § 8(*l*), 2011 Kan. Sess. Laws 795, 806, 809–11 (codified at Kan. Stat. Ann. § 25-2309(*l*)). The requirement took effect January 1, 2013. *Id.* at § 8(u), 2011 Kan. Sess. Laws at 812. The SAFE Act requires that

> (l) The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship. Evidence of United States citizenship as required in this section will be satisfied by presenting one of the documents listed . . . in person at the time of filing the application for registration or by including a photocopy of one of the following documents with a mailed registration application. After a person has submitted satisfactory evidence of citizenship, the county election officer shall indicate this information in the person's permanent voter file.

Kan. Stat. Ann. § 25-2309(*l*). The statute then lists thirteen forms of documentation acceptable to prove U.S. citizenship, including a birth certificate or passport. *See* § 25-

6

2309(*l*)(1)–(13).  For citizens unable to present DPOC, subsection (m) provides an alternate means to prove citizenship by the submission of evidence to the state election board followed by a hearing.  *See* § 25-2309(m).  The state election board is composed of "the lieutenant governor, the secretary of state and the attorney general."  § 25-2203(a).

Secretary Kobach promulgated regulations for the DPOC requirement on October 2, 2015.  Kan. Admin. Regs. § 7-23-15 (the "90-day regulation").  Those regulations provide that applications unaccompanied by DPOC are deemed to be "incomplete."  § 7-23-15(a).  Once an application is designated as incomplete, a voter has ninety days to provide DPOC or else the application is canceled and a new voter-registration application is required to register.  *See* § 7-23-15(b)–(c).

We believe that it will provide useful context for our subsequent discussion of the procedural history of the present case for us to briefly refer to Kansas's prior litigation before our court involving the DPOC issue.  Some groundwork must be laid first, however.  In 2013, an Arizona DPOC requirement was challenged as running afoul of sections 6 and 9 of the NVRA.  *Arizona v. Inter Tribal Council of Ariz., Inc. (Inter Tribal)*, — U.S. —, 133 S. Ct. 2247, 2252–53 (2013).  Section 9 provides for a universal mail-in form for voter registration for federal elections (the "Federal Form") and entrusts the creation and administration of that form to the Election Assistance Commission (the "EAC") in consultation with the chief election officers of the states.  *See* 52 U.S.C. § 20508(a).  Section 6 provides that "[e]ach State shall accept and use the mail voter registration application form prescribed by . . . Section 20508(a)(2)."  § 20505(a)(1).  The

7

case came before the U.S. Supreme Court, which was faced with the question of whether the federal statutory requirement that states "accept and use" the Federal Form preempted Arizona's law requiring officials to reject Federal Form applications unaccompanied by DPOC. *See Inter Tribal*, 133 S. Ct. at 2253. The Court held that the NVRA did require Arizona to accept Federal Forms unaccompanied by DPOC but also stated that Arizona could petition the EAC to add a state-specific instruction requiring DPOC and, in the case of its refusal to add it, the state could obtain judicial review of the EAC decision. *Id.* at 2259–60. The court further held that to raise a constitutional doubt under the Qualifications Clause (i.e., U.S. CONST. art. I, § 2, cl. 1), the state would have had to show that the law precluded it "from obtaining information necessary for enforcement" of the state's voter qualifications. *Id.* at 2259.

Ken Bennet, then Secretary of State of Arizona, together with Secretary Kobach, subsequently requested that the EAC add state-specific instructions for Arizona and Kansas requiring DPOC. Rebuffed by the EAC, they filed suit in the District of Kansas attempting to force the EAC to grant their request to add Arizona- and Kansas-specific DPOC instructions to the Federal Form or to obtain a judgment that the NVRA was unconstitutional as applied. *Kobach v. U.S. Election Assistance Comm'n* (*EAC*), 772 F.3d 1183, 1187–88 (10th Cir. 2014). They prevailed in district court, but we reversed on appeal. Specifically, we rejected their challenge and held that the EAC's refusal was in accordance with the NVRA and the Administrative Procedure Act and that no Qualifications Clause issue had been raised. *See id.* at 1199. Now we proceed to the

8

procedural circumstances of this case.

## B.    Procedural Background

Steven Wayne Fish, Donna Bucci, Charles Stricker, Thomas J. Boynton, and Douglas Hutchinson (together with the League of Women Voters of Kansas,[6] the "Plaintiffs-Appellees") filed their initial complaint in the U.S. District Court for the District of Kansas on February 18, 2016.  The individual Plaintiffs-Appellees are U.S. citizens eligible to vote who claim that they have been prevented from registering to vote by Kansas's DPOC requirement.  Bringing suit under the private right of action established by the NVRA, 52 U.S.C. § 20510(b), and 42 U.S.C. § 1983, Plaintiffs-Appellees allege that Kansas's DPOC requirement and the 90-day regulation are preempted by the NVRA and are unconstitutional under both the Elections Clause (i.e., U.S. CONST. art. I, § 4, cl. 1) and the Privileges and Immunities Clause (i.e., U.S. CONST. art. IV, §2, cl. 1).  After Plaintiffs-Appellees filed their motion for a preliminary injunction on February 25, 2016, limited and expedited discovery ensued.  In response to the preliminary injunction motion, Secretary Kobach argued that the NVRA did not speak to or preempt state DPOC requirements and, to so interpret the statute, would raise a doubt as to whether the NVRA was constitutional because it would bring the statute into conflict with the states' power under the Qualifications Clause.  The district court disagreed, issuing a memorandum and order on May 17.

---

[6]    The League of Women Voters of Kansas was joined as a plaintiff by an amended complaint filed March 17, 2016.

The order granted in part and denied in part the Plaintiffs-Appellees' motion for a preliminary injunction. The court denied the motion as to enjoining enforcement of the 90-day regulation, holding that the Plaintiffs-Appellees were unlikely to prevail on their claim that the regulation was preempted by Section 8 of the NVRA. But the court granted the motion to enjoin Kansas from enforcing the DPOC requirement and further enjoined Secretary Kobach to register each person whose application had been suspended or cancelled for failure to provide DPOC.[7] The court did so on the grounds that the

_____

[7] The injunction issued by the district court requires Secretary Kobach to register for purposes of both congressional and presidential elections those applicants unable to provide DPOC but who have otherwise filled out valid motor voter forms. The NVRA, by relying on the definitions of federal campaign finance law, applies expressly to all federal general and primary elections, including presidential elections. 52 U.S.C. § 20502(1)–(2) (incorporating the definitions of "election" and "Federal office" from § 30101(1), (3)); § 30101(1) (defining "election" to include general and primary elections and caucuses); § 30101(3) (defining "Federal office" to include the presidency, vice presidency, and congressional offices).

We recognize that, by its literal terms, the Elections Clause only addresses congressional elections. *See* U.S. CONST. art. I, § 4, cl. 1. But both the Supreme Court and our sister courts have rejected the proposition that Congress has no power to regulate presidential elections. *See id.* art. II, § 1, cl. 4 (expressly providing as to the election of the President and Vice-President, "The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States"). *Compare Buckley v. Valeo*, 424 U.S. 1, 90 (1976) (per curiam) ("Congress has power to regulate Presidential elections and primaries . . . .") *and ACORN v. Miller*, 129 F.3d 833, 836 n.1 (6th Cir. 1997) ("Congress has been granted authority to regulate presidential elections . . . ."), *with Inter Tribal*, 133 S. Ct. at 2268 n.2 (Thomas, J., dissenting) ("Constitutional avoidance is especially appropriate in this area because the NVRA purports to regulate presidential elections, an area over which the Constitution gives Congress no authority whatsoever.").

Regarding this case, no party has raised the issue of whether the NVRA—which we must infer, for reasons explicated *infra* at note 9, was enacted pursuant to the Elections Clause—may constitutionally extend to presidential elections. Accordingly, we

10

minimum-information principle of NVRA section 5 preempted Kansas's DPOC requirements and, in that regard, Secretary Kobach had failed to show that the statute's attestation requirement did not meet this statutory principle or to raise a constitutional doubt under the Qualifications Clause.

To reach this conclusion, the court first interpreted the term "minimum" in NVRA section 5 to bear its plain meaning. Accordingly, under the minimum-information principle, a "State may require only the least possible amount of information necessary to enable State election officials to assess whether the applicant is a United States Citizen." *Fish v. Kobach*, — F. Supp. 3d —, 2016 WL 2866195, at *16 (D. Kan. 2016). Next the court determined that DPOC was quite burdensome whereas attestation was less burdensome and had successfully prevented all but a very few noncitizens from registering to vote. DPOC was therefore adjudged to be greater than the least amount of information necessary and preempted by the NVRA, while attestation met the statutory minimum-information principle. Lastly, the court rejected Secretary Kobach's Qualifications Clause challenge to preemption under the NVRA. Guided by *Inter Tribal* and *EAC*, the court held that, because Kansas had failed to show that the statutory attestation requirement resulted in a "significant number of noncitizens voting," the NVRA's preemption of Kansas's DPOC requirement did not preclude the state from

have no need to opine on this issue. Consequently, as we use the term in this opinion, "federal elections" reaches the full spectrum of elections—both congressional and presidential; this is consistent with both the plain meaning of the NVRA, § 20502(1)–(2), and the terms of the district court's injunction, which we affirm today.

enforcing its citizenship qualification in contravention of the Qualification Clause. *Id.* at

*23.

After the court issued its preliminary injunction, Secretary Kobach timely

appealed, arguing that the district court erred in its interpretation of the NVRA, that the

Plaintiffs-Appellees had failed to meet the irreparable-harm standard, and that the balance

of harms was improperly weighed.[8]

C.       **Statutory Background: The National Voter Registration Act**

1.       **General Purposes and Structure**

Acting pursuant to the Elections Clause,[9] Congress crafted and passed the NVRA

---

[8]       The district court also denied a motion to dismiss for lack of subject matter jurisdiction brought by the other defendant in the case. That defendant, Nick Jordan, the Secretary of Revenue for the State of Kansas—under whose purview the Kansas DMV falls—has filed a separate appeal with this court under the name *Fish v. Jordan*, No. 16-3175.

[9]       Although Congress did not expressly invoke the Elections Clause in enacting the NVRA, both the Supreme Court and our court have operated on the premise that the Elections Clause was Congress's source of authority in enacting the NVRA, in resolving disputes that are analogous to the present one. *See, e.g.*, *Inter Tribal*, 133 S. Ct. at 2257 ("We conclude that the fairest reading of the statute is that a state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form. If this reading prevails, *the Elections Clause requires that Arizona's rule give way*." (emphasis added) (citation omitted)); *id.* at 2256–57 (holding, with reference to the NVRA, that traditional Supremacy Clause preemption analysis does not apply to legislation passed under the Elections Clause); *EAC*, 772 F.3d at 1194–95 (observing with reference to the NVRA that "the [*Inter Tribal*] Court reaffirmed that the United States has authority under the Elections Clause to set *procedural* requirements for registering to vote in federal elections"). In light of this controlling precedent, we are constrained to infer that Congress was acting pursuant to its Elections Clause power when it enacted the NVRA.

against a backdrop of lackluster voter registration and political participation. Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). In crafting the NVRA, Congress had four overriding purposes:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

§ 20501(b).

To achieve these purposes, the NVRA creates three federally mandated voter-registration mechanisms, two of which are implemented almost entirely by the states. Section 4 provides the basic outlines of the statute's requirements:

> [N]otwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office—
>
> > (1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504 of this title;

13

(2)     by mail application pursuant to section 20505 of this title;

(3)     by application in person—

. . . .

(B)     at a Federal, State, or nongovernmental office designated under section 20506 of this title.

§ 20503(a). Together, these mechanisms ensure that, whatever else the states do, simple means are available to register for federal elections and those means are actively presented to voters by the states. The NVRA thus mandates both the means by which registration is achieved and where and how those means will be presented to potential voters.

The NVRA sets requirements for the contents of both the Federal Form and any state forms used in the motor voter or agency registration processes. The contents of the mail-in Federal Form of sections 6 and 9 (the subject of both *Inter Tribal* and *EAC*) are prescribed partly by statute, § 20508(b), and otherwise entrusted to the administrative judgment of the EAC, a federal agency. *See* § 20508(a); *EAC*, 772 F.3d at 1195–96. While states are permitted to create their own mail-in forms, § 20505(a)(2), they must nevertheless accept and use the Federal Form, *see* § 20505(a)(1)–(2); *Inter Tribal*, 133 S. Ct. at 2247. Similarly, in the context of Section 7's agency provisions, state agencies must either distribute the Federal Form or use "the office's own form if it is equivalent to the form described in section 20508(a)(2)," i.e. the Federal Form.

14

§ 20506(a)(6)(A)(i)–(ii).

By contrast, section 5's motor voter provisions require states to develop a form for use in tandem with applications to obtain or renew a driver's license. *See* § 20504(c). But the NVRA does not give states a free hand to determine the contents of their motor voter forms. The statute sets out requirements for the contents of state motor voter forms in terms that largely mirror the requirements for the Federal Form—but that also differ in important ways. *Compare* § 20504(c)(2) (motor voter form requirements), *with* § 20508(b) (Federal Form requirements).

In addition to mandating and regulating the means of voter registration, the NVRA requires that states actively present voters with those means. Alongside the motor voter regime, section 7's agency provisions require state public assistance agencies and other offices designated by the state (as well as armed forces recruitment offices) to distribute with their applications for services either the Federal Form or an "equivalent" state form and to accept completed forms for transmittal to state election officials. § 20506(a)(1)–(4), (6); *see also* § 20506(c) (military recruitment office provision). Congress intended with this provision to reach potential voters who would otherwise not be reached by the motor voter program. *See* H.R. REP. NO. 103-66, at 19 (1993) (Conf. Rep.) ("If a State does not include either public assistance, agencies serving persons with disabilities, or unemployment compensation offices in its agency program, it will exclude a segment of its population from those for whom registration will be convenient and readily available—the poor and persons with disabilities who do not have driver's

15

licenses and will not come into contact with the other principle [sic] place to register under this Act. . . . The only way to assure that no State can create an agency registration program that discriminates against a distinct portion of its population is to require that the agencies designated in each State include an agency that has regular contact with those who do not have driver's licenses."), *as reprinted in* 1993 U.S.C.C.A.N. 140, 144.

The motor voter provision assures that all persons who drive will sooner or later be presented with an opportunity to register to vote:

> Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

§ 20504(a)(1). Once a valid motor voter registration form is submitted to a state, the state is required to ensure registration so long as the form is submitted within the lesser of thirty days before the election date or the period provided by state law. *See* § 20507(a)(1)(A). Indeed, section 8 requires that whenever any "valid voter registration form" mandated by the statute is submitted, the state must ensure registration to vote in an election so long as the form was submitted within the requisite time period. § 20507(a)(1)(A)–(C). In other words, when an eligible voter avails herself of one of the mandated means of registration and submits to the state a valid form, ordinarily the state must register that person. *See Inter Tribal*, 133 S. Ct. at 2255.

16

## 2. The Motor Voter Provisions

In the present case, only the motor voter provisions are at issue—specifically, the requirements for the contents of motor voter forms. Subsection (c) of section 5 both sets out specific requirements for the motor voter form and establishes an overarching principle that restrains the discretion of states to require additional information in carrying out their eligibility-assessment and registration duties. The relevant statutory language reads:

> (2) The voter registration application portion of an application for a State motor vehicle driver's license—
>
>     (A) may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));
>
>     (B) may require only *the minimum amount of information necessary* to—
>
>         (i) prevent duplicate voter registrations; and
>
>         (ii) enable state election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
>
>     (C) shall include a statement that—
>
>         (i) states each eligibility requirement (including citizenship);
>
>         (ii) contains an attestation that the applicant meets each such requirement; and
>
>         (iii) requires the signature of the applicant, under

penalty of perjury[.]

§ 20504(c)(2)(A)–(C) (emphasis added). Thus, under subparagraph (A), no duplicate information may be required, § 20504(c)(2)(A); under subparagraph (B), while states may require more than what is expressly required by the NVRA, such discretion is restricted by the principle that the states not require more than "the minimum amount of information necessary to" prevent duplicate registrations and to carry out their eligibility-assessment and registration duties, § 20504(c)(2)(B); and under subparagraph (C) the application must include a list of eligibility requirements, "including citizenship," and a signed attestation under penalty of perjury that the applicant meets those requirements, § 20504(c)(2)(C).

## II. DISCUSSION

After stating our standard of review, we begin by recalling the elements of the preliminary injunction standard. We then discuss each prong of the preliminary injunction standard, beginning with the likelihood of success on the merits. In determining whether the district court erred in holding that the Plaintiffs-Appellees were likely to succeed on the merits, we consider first the nature of Congress's power under the Elections Clause and Congress's role in regulating elections vis-à-vis the states. We next consider preemption questions and the nature of statutory interpretation under the Elections Clause. Under the Elections Clause, we apply ordinary tools of statutory interpretation and any conflicting state provision is preempted.

Third, we interpret the meaning of the NVRA's requirements for state motor voter

18

forms and hold that the NVRA attestation requirement presumptively meets the minimum-information principle; it therefore preempts Kansas's DPOC requirement absent a factual showing that the attestation requirement is insufficient on these facts to satisfy that principle. Next we examine whether Secretary Kobach has succeeded in showing that attestation is insufficient under the statutory minimum-information principle and hold that he has not. Last, we turn to Secretary Kobach's Qualifications Clause arguments and the remaining prongs of the preliminary injunction standard.

## A. Standard of Review

On appeal, we review a district court's decision to grant a preliminary injunction for abuse of discretion. *See, e.g.*, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). An abuse of discretion occurs where a decision is premised "on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1223–24 (10th Cir. 2008)). Thus, we review the district court's factual findings for clear error and its conclusions of law de novo. *Heideman*, 348 F.3d at 1188.

## B. Preliminary Injunction Standard

Four factors must be shown by the movant to obtain a preliminary injunction: (1) the movant "is substantially likely to succeed on the merits; (2) [the movant] will suffer irreparable injury if the injunction is denied; (3) [the movant's] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the

19

injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

Additionally, some preliminary injunctions are disfavored and require a stronger showing by the movant—*viz.*, movants must satisfy a heightened standard. They are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Awad*, 670 F.3d at 1125 (quoting *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048–49 (10th Cir. 2007), *rev'd on other grounds*, 555 U.S. 460 (2009)). In seeking such an injunction, the movant must "make[] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Beltronics*, 562 F.3d at 1071 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)). The parties dispute whether the injunction requested here falls under one or more of these categories. The district court did not reach the question because it held that the Plaintiffs-Appellees had made a sufficiently strong showing to meet the heightened standard. Similarly, we decline to reach the question of whether the heightened standard for disfavored preliminary injunctions applies and hold that, even assuming *arguendo* that the heightened standard applies, the Plaintiffs-Appellees meet that standard.

C. **Likelihood of Success on the Merits**

We first examine the text of the Elections Clause and the Supreme Court's jurisprudence concerning statutory interpretation and preemption under that clause. We

next interpret the NVRA's requirements for the contents of state motor voter forms and apply that interpretation to the facts as found by the district court. Last, we address Secretary Kobach's arguments regarding constitutional doubt under the Qualifications Clause.

### 1.    The Elections Clause

The Elections Clause states:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. CONST. art. I, § 4, cl. 1. The plain text of the clause requires the states to provide for the regulation of congressional elections. *See Inter Tribal*, 133 S. Ct. at 2253; *Foster v. Love*, 522 U.S. 67, 69 (1997). The text makes equally clear, however, that Congress can step in, either making its own regulations that wholly displace state regulations or else modifying existing state regulations. *See Inter Tribal*, 133 S. Ct. at 2253 ("The Clause empowers Congress to preempt state regulations governing the 'Times, Places and Manner' of holding congressional elections.").

This unusual allocation of powers and responsibilities between the federal government and the states stems from the Founders' concern that the states could refuse to conduct federal elections, effectively terminating the national government. *See id.*; *see also* THE FEDERALIST NO. 59, at 328 (Alexander Hamilton) (Robert A. Ferguson ed., 2006) ("Nothing can be more evident, than that an exclusive power of regulating elections

21

for the national government, in the hands of the state legislatures, would leave the existence of the union entirely at their mercy. They could at any moment annihilate it, by neglecting to provide for the choice of persons to administer its affairs."). Thus, although the regulation of congressional elections is in the first instance entrusted by the Elections Clause to the states, Congress can always intervene. Indeed, the Anti-Federalists themselves recognized the preemptive power of Congress under the Elections Clause, although they discerned more insidious motives in its breadth. *See Federal Farmer No. XII* (Jan. 12, 1788), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 294, 300 (Herbert J. Storing, ed., 1981) ("[T]he true construction is, that when congress shall see fit to regulate the times, places, and manners of holding elections, congress may do it, and state regulations, on this head, must cease. . . . [But] it was not merely to prevent an annihilation of the federal government that congress has power to regulate elections.").

Justice Story also shared this understanding of the Elections Clause, despite the fact that in the decades between the Constitution's adoption and the drafting of his commentary on the Elections Clause, Congress had not exercised this preemptive power. 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 824, at 290–92 (Fred B. Rothman & Co. 1991) (1833). He characterized the preemptive power of the clause as constituting a "superintending" or "supervisory" power over state regulations. *See, e.g.*, *id.* §§ 813, 820, at 280, 288. He also observed that opponents of the Constitution "assailed" the Elections Clause "with uncommon zeal and virulence" because of the express power granted to Congress to preempt state election regulations.

*Id.* § 813, at 280.

The Supreme Court has hewn to this view of the Elections Clause since at least 1880 in *Ex parte Siebold*, 100 U.S. 371 (1879) and has reaffirmed it in both *Inter Tribal* and in *Foster v. Love*, 522 U.S. 68 (1997). In *Ex parte Siebold*, the Court was presented with the argument—put forth by defendants seeking habeas relief, following their conviction under federal law for ballot box stuffing—that when Congress acts under the Elections Clause, it must, in modern terms, occupy the field. 100 U.S. at 382–83 ("[T]hey contend that [Congress] has no constitutional power to make partial regulations to be carried out in conjunction with regulations made by the States."). Although the Court agreed that Congress could, if it so desired, occupy the field of election regulations, the Court flatly rejected the proposition that Congress could not partially regulate alongside state regulations or alter state regulations; in doing so, the Court made clear that when Congress makes or alters regulations and this action engenders conflict with state election regulations, state law must give way:

> If Congress does not interfere [with state election regulations], of course they may be made wholly by the State; but if it chooses to interfere, there is nothing in the words to prevent its doing so, either wholly or partially. . . . If it only alters, leaving, as manifest convenience requires, the general organization of the polls to the State, there results a necessary co-operation of the two governments in regulating the subject. *But no repugnance in the system of regulations can arise thence; for the power of Congress over the subject is paramount. It may be exercised as and when Congress sees fit to exercise it. When exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them. This is implied in the power to "make or* alter."

23

*Id.* at 383–84 (emphasis added; emphasis on "alter" in the original). This concept of the Election Clause's preemptive reach has not fallen into desuetude since then.

The Supreme Court has recently and repeatedly reaffirmed that "the power the Elections Clause confers is none other than the power to pre-empt." *Inter Tribal*, 133 S. Ct. at 2257. In *Foster v. Love*, the Court observed, "The Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." 522 U.S. at 69 (citations omitted). Indeed, when Congress legislates under the Elections Clause, "it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Inter Tribal*, 133 S. Ct. at 2257.

Further, both the Supreme Court and this court have recognized that the power to preempt state regulations of "time, places, and manner" extends to the regulation of voter registration:

> "The Clause's substantive scope is broad. 'Times, Places, and Manner,' we have written, are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections,' including, as relevant here and as petitioners do not contest, regulations relating to 'registration.'"

*EAC*, 772 F.3d at 1195 (quoting *Inter Tribal*, 133 S. Ct. at 2253); *see also Smiley v. Holm*, 285 U.S. 355, 366 (1932) (source for the second-level internal quotations). Congress therefore has the power to preempt state voter-registration regulations.

Although the preceding doctrine is well settled, it is important to define clearly the relationship that the Constitution establishes between the states and the federal

24

government and the extent and nature of the power delegated to each. Congress permissively allows the states to regulate, but only to the extent that Congress chooses not to regulate. Congress possesses the power to alter existing state regulations—not the other way around. At bottom, Secretary Kobach argues that states should be able to modify existing federal election regulations, in order to repurpose an existing federal registration regime for the states' own ends. This would invert the relationship that the Elections Clause establishes between Congress and the states because it would give the states—rather than Congress—the last word. Having established Congress's preemptive power under the Elections Clause, we turn now to how to interpret the scope of preemption.

### 2. Preemption and Statutory Interpretation Under the Elections Clause

Sitting en banc, the Ninth Circuit, in *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), *aff'd sub nom. Inter Tribal*, 133 S. Ct. 2247, has offered a persuasive synthesis of the method of statutory construction required when a congressional enactment under the Elections Clause allegedly conflicts with state election regulations. There, the Ninth Circuit construed *Siebold* and *Foster* as requiring courts to consider the relevant congressional and state laws as part of a single statutory scheme but treating the congressional enactment as enacted later and thus superseding any conflicting state provision:

> Reading *Siebold* and *Foster* together, we derive the following approach for determining whether federal enactments under the

25

Elections Clause displace a state's procedures for conducting federal elections. First, as suggested in *Siebold*, we consider the state and federal laws as if they comprise a single system of federal election procedures. *Siebold*, 100 U.S. at 384. If the state law complements the congressional procedural scheme, we treat it as if it were adopted by Congress as part of that scheme. *See id.* If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature. *Foster*, 522 U.S. at 74, 118 S. Ct. 464; *see id.* at 72–73, 118 S. Ct. 464. If the two statutes do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to "alter" the state's regulation, and that regulation is superseded.

*Gonzalez*, 677 F.3d at 394. This framework that the Ninth Circuit has articulated is supported by close readings of *Siebold* and *Foster* as well the Supreme Court's more recent decision, *Inter Tribal*, as we demonstrate *infra*. We first address the closely related decision, *Inter Tribal,* to show that the Court did not repudiate or abandon the framework of *Siebold* and *Foster*—indeed *Inter Tribal* depends on them—before turning to those cases.

In *Inter Tribal*, the Court rejected Arizona's argument that the presumption against preemption applies in Elections Clause cases and held instead that the plain text of a federal statute "accurately communicates the scope of Congress's preemptive intent." *Inter Tribal*, 133 S. Ct. at 2257. First, it observed that the rationale underlying the presumption against preemption under the Supremacy Clause does not apply to the Elections Clause. As to the Supremacy Clause, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 2256 (quoting *Rice v. Santa*

26

*Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Thus, "'Congress does not exercise lightly' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)); *cf. United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").

But the regulation of congressional elections is not a subject of state police power nor one that is traditionally the province of the states. Nor could it be, because the states' power over congressional elections—or rather the duty to provide for elections—derives from an express grant in the Constitution. *See* U.S. CONST. art. 1, § 4, cl. 1; *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995) ("As Justice Story recognized, 'the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them . . . .'" (quoting 1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 627)); *id.* at 804–05 ("It is surely no coincidence that the context of federal elections provides one of the few areas in which the Constitution expressly requires action by the States . . . . This duty parallels the duty under Article II [to appoint electors to choose the president]."). Thus "[u]nlike the States' 'historic police powers,' the States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'" *Inter Tribal*, 133 S. Ct. at 2257 (citations omitted) (quoting, respectively, *Rice*, 331 U.S.

27

at 230; *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). The Court concluded, "[T]here is no compelling reason *not* to read Elections Clause legislation *simply to mean what it says*." *Inter Tribal*, 133 S. Ct. at 2257 (emphases added).

Applying these concepts, the Court held that under "the fairest reading of the statute" Arizona's DPOC requirement was inconsistent with the NVRA's requirement that states "accept and use" the Federal Form and, thus, preempted. *Id.* To arrive at this result, the Court simply compared Arizona's DPOC requirement with the requirements of the NVRA and asked whether Arizona's requirement conflicted with the NVRA—to the extent that it did, Arizona's DPOC law was preempted by the NVRA. *Id.* ("If this reading prevails, the Elections Clause requires that Arizona's rule give way.").

Further, *Siebold* and *Foster* help to more fully flesh out how to approach this interpretive task and how it is influenced by Congress's presumptively preemptive power under the Elections Clause. In *Siebold*, the Court likened the task of statutory construction in a case of federal-state conflict under the Elections Clause to that of reading a single, harmonious code of regulations. This analogy derives from Congress's plenary power under the Elections clause: "If [Congress] only alters [state regulations] . . . there results a necessary co-operation of the two governments in regulating the subject. But no repugnance in the system of regulations can arise thence; for the power of congress over the subject is paramount." *Siebold*, 100 U.S. at 383–84. The court then likened the analysis to reading the state and federal provisions as part of a single statutory scheme:

> Suppose the Constitution of a State should say, "The first legislature elected under this Constitution may by law regulate the election of members of the two Houses; but any subsequent legislature may make or alter such regulations,"—could not a subsequent legislature modify the regulations made by the first legislature without making an entirely new set? Would it be obliged to go over the whole subject anew? Manifestly not: it could alter or modify, add or subtract, in its discretion. The greater power, of making wholly new regulations, would include the lesser, of only altering or modifying the old. The new law, if contrary or repugnant to the old, would so far, and so far only, take its place. If consistent with it, both would stand. The objection, so often repeated, that such an application of congressional regulations to those previously made by a State would produce a clashing of jurisdictions and a conflict of rules, loses sight of the fact that the regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.

*Id.* at 384.

*Foster* establishes that the reading to be applied to the federal and state statutes at issue is a plain one. In *Foster*, the Court was presented with the question of whether a Louisiana statute violated a federal law that set the date for congressional elections. 522 U.S. at 70. Louisiana's law created an open primary in October such that if no candidate took a majority, a runoff would be held between the two highest performing candidates on the federally mandated election day. *Id.* But this could and did result in congressional elections being decided in October, *id.*, rather than on the federally mandated "Tuesday next after the 1st Monday of November," *id.* at 69. The Court, rather than getting lost in the "nicety [of] isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute," *id.* at 72, instead applied a plain meaning analysis of the two statutes (i.e., the state and federal statutes): "The

29

State's provision for an October election addresses timing quite as obviously as [the federal statute] does. . . . [T]he open primary does purport to affect the timing of federal elections: a federal election takes place prior to federal election day whenever a candidate gets a majority in the open primary." *Id.* at 72–73. In other words, the fact that the federal and state regulations both spoke to the same issue and differed in their requirements was sufficient to preempt the state regulation. Importantly, the Court reached this conclusion without parsing the congressional enactment for lacunae or silences where the state could regulate. Thus, the Court held that "a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates [the federal statute]." *Id.* at 72.

Guided by these cases, it is clear to us that the Elections Clause requires that we straightforwardly and naturally read the federal and state provisions in question as though part of a unitary system of federal election regulation but with federal law prevailing over state law where conflicts arise. We do not finely parse the federal statute for gaps or silences into which state regulation might fit. We refrain from doing so because were states able to build on or fill gaps or silences in federal election statutes—as Secretary Kobach suggests he is permitted to do with respect to the NVRA—they could fundamentally alter the structure and effect of those statutes. If Congress intended to permit states to so alter or modify federal election statutes, like the NVRA, it would have

30

so indicated.  The Elections Clause does not require Congress to expressly foreclose such modifications by the states.

### i. The Plain Statement Rule Derives from the Presumption Against Preemption and Does Not Apply to Legislation Under the Elections Clause

Secretary Kobach argues—while conceding that there is no presumption against preemption under the Elections Clause—that the plain statement rule nonetheless applies. That rule requires that, when Congress intends to preempt state law, "it must make its intention to do so 'unmistakably clear in the language of the statute.'"  *Gregory*, 501 U.S. at 460 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)).  But as the Plaintiffs-Appellees point out, this argument was forfeited for failure to raise it before the district court.

"[I]f [a new] theory simply wasn't raised before the district court, we usually hold it forfeited."  *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011).  A forfeited argument, unlike one that is waived, may nonetheless be presented and considered on appeal—but we will *reverse* a district court's judgment on the basis of a forfeited argument "only if failing to do so would entrench a plainly erroneous result." *Id.*  Further, under *Richison*, "the failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court."  *Id.* at 1131.

Secretary Kobach contends that he "*repeatedly* argued below that the NVRA must contain an express statement prohibiting DPOC if any preemption can occur."  Aplt.'s

31

Reply Br. 12 n.5. He points to five pages of his Memorandum in Opposition to Plaintiffs'

Motion for Preliminary Injunction, but that section of his briefing before the district court

argues only that the statute is silent and cannot be construed to prohibit DPOC, reasoning

from precedent and ordinary principles of statutory interpretation. No mention is made of

the plain statement rule. Our review of the record below does not reveal any other

material that could fairly be read to present Secretary Kobach's plain statement theory.

Nor does he make an argument for plain error review on appeal. Consequently, his plain

statement argument has come to the end of the road and is effectively waived.

In seeking to avoid such an outcome, in his reply brief, Secretary Kobach concedes

that in his briefing before the district court he cited no caselaw regarding the plain

statement rule. *Id.* But he points to *United States v. Johnson*, 821 F.3d 1194 (10th Cir.

2016) for the proposition that "[o]nce a federal claim is properly presented, a party can

make any argument in support of that claim; parties are not limited to the precise

arguments they made below." *Id.* at 1199 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*,

513 U.S. 374, 379 (1995)). On the basis of *Johnson*, he argues that the "claim (minus the

case law) was certainly presented," so his theory was not forfeited. Aplt.'s Reply Br. 12

n.5. But this argument is spurious under our forfeiture and waiver principles.

The proposition from *Johnson* is not relevant in this context because the heart of

our waiver and forfeiture doctrines lies in the recognition that we are not "a 'second-shot'

forum, a forum where secondary, back-up *theories* may be mounted for the first time.

Parties must be encouraged 'to give it everything they've got' at the trial level." *Tele-*

*Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997) (emphasis added) (citation omitted). Theories—as opposed to the overarching claims or legal rubrics that provide the foundation for them—are what matters. *Richison*, 634 F.3d at 1127 ("Where, as here, a plaintiff pursues a new legal *theory* for the first time on appeal, that new *theory* suffers the distinct disadvantage of starting at least a few paces back from the block." (emphasis added)); *see Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993) (noting that "a situation where a litigant changes to a new *theory* on appeal that falls under the same general category as an *argument* presented at trial" constitutes a failure of preservation where the issue was "not passed upon below [and thus] will not be considered on appeal" (emphasis added)); *accord McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002) (stating that forfeiture and waiver apply to a "new theory on appeal that falls under the same general category as an argument presented at trial" (quoting *Lyons*, 994 F.2d at 722)). We have expressly rejected the notion that Secretary Kobach urges: "It would force the judicial system to permit costly 'do-overs' in the district court anytime a party can conceive a new winning *argument* on appeal—even when the district court answered perfectly every question of law the parties bothered to put before it." *Richison*, 634 F.3d at 1130 (emphasis added). Secretary Kobach failed to raise an argument based on a plain statement theory before the district court and fails also to make an argument for plain error. Therefore, we would be well within the boundaries of our discretion to decline to consider his plain statement argument.

Even were we to reach Secretary Kobach's plain statement argument, we would

33

conclude that it lacks merit: specifically, it rests both on an incomplete reading of the plain statement cases that he cites and on an erroneous distinction between the presumption against preemption and the plain statement rule. In this regard, *Gregory*, which Secretary Kobach cites, makes clear that the plain statement rule applies only where "Congress intends to alter the 'usual constitutional balance between the States and the Federal Government.'" 501 U.S. at 460 (quoting *Will*, 491 U.S. at 65). Or, as Secretary Kobach's brief quotes *Gregory*, "This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." Aplt.'s Opening Br. 28 (quoting *Gregory*, 501 U.S. at 461). But the states in fact have no inherent sovereign power in the area at issue here—federal elections—nor could they have any if not for the Constitution's delegation of power to the states. And this delegation is expressly limited by Congress's power to "make or alter" state regulations. *See Inter Tribal*, 133 S. Ct. at 2256–57, 2257 n.6; *U.S. Term Limits*, 514 U.S. at 802, 804–05; *see also* Discussion *supra* Section II.C.2.

Unsurprisingly, Secretary Kobach is unable to cite Elections Clause cases to support his plain statement argument: *Will* addressed congressional preemption of sovereign immunity, 491 U.S. at 64–65; *Gregory* concerned whether the Age Discrimination in Employment Act was intended to preempt state, age-based mandatory retirement provisions for judges, 501 U.S. at 460–61; and *Sugarman v. Dougall*, 413 U.S. 634, 635–36 (1973), is not even a preemption case, dealing instead with whether a state

34

may bar aliens from civil service positions under the Fourteenth Amendment. This inability to cite even one case applying the plain statement rule in the Elections Clause context is telling.

In truth, contrary to Secretary Kobach's suggestion, the plain statement rule is not independent of the presumption against preemption; instead, it is one way that the presumption is applied. *See Gonzales v. Oregon*, 546 U.S. 243, 291–92 (2006) (Scalia, J., dissenting) ("The clear-statement rule based on the presumption against preemption does not apply because the Directive does not pre-empt any state law."). "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision [to interpret a statute as effecting preemption of state law]." *Gregory*, 501 U.S. at 461 (quoting *Will*, 491 U.S. at 65). However, the Supreme Court has noted that this presumption against preemption occurs nowhere in its Election Clause jurisprudence. *Inter Tribal*, 133 S. Ct. at 2256 ("We have never mentioned such a principle [i.e., the presumption] in our Elections Clause cases."). Similarly, the Ninth Circuit observed that the Court has never applied either the presumption or the plain statement rule in the context of Elections Clause legislation. *Gonzalez*, 677 F.3d at 392 ("[T]he 'presumption against preemption' and 'plain statement rule' that guide Supremacy Clause analysis are not transferable to the Elections Clause context. . . . [O]ur survey of Supreme Court opinions deciding issues under the Elections Clause reveals no case where the Court relied on or even discussed Supremacy Clause

35

principles.").

The reason for this absence is patent. Because Congress's regulation of congressional elections *necessarily* displaces state regulations, and because the states have no power *qua* sovereigns to regulate such elections, *Inter Tribal*, 133 S. Ct. at 2257 & n.6, the plain statement rule, as a creature of the presumption against preemption, has no work to do in the Elections Clause setting—*viz.*, it is unnecessary to prevent inadvertent or ill-considered preemption from altering the traditional state-federal balance. *See Gonzalez*, 677 F.3d at 392 ("[T]he Elections Clause, as a standalone preemption provision, establishes its own balance [between competing sovereigns]. For this reason, the 'presumption against preemption' and 'plain statement rule' that guide Supremacy Clause analysis are not transferable to the Elections Clause context.").

Therefore, Secretary Kobach's reliance on the plain statement rule is misplaced.[10]

---

[10]    In light of our prior discussion of *Inter Tribal*, it is unnecessary to dissect Secretary Kobach's argument that *Inter Tribal* applied the plain statement rule. To the contrary, *Inter Tribal* expressly rejected stricter standards of statutory interpretation predicated on the presumption against preemption; instead—eschewing such standards —it simply construed the plain terms of the NVRA. 133 S. Ct. at 2257. Indeed, Secretary Kobach's approach would cause us ill-advisedly to embrace the position of the *dissent* in *Inter Tribal*. There, Justice Alito opined, "The NVRA does not come close to manifesting *the clear intent to pre-empt* that we should expect to find when Congress has exercised its Elections Clause power in a way that is constitutionally questionable." *Id.* at 2273 (Alito, J., dissenting) (emphasis added). It is beyond peradventure that Justice Alito was not in this passage speaking for the court or establishing the law regarding the interpretation of the NVRA. Quite the contrary is true. *Cf. EAC*, 772 F.3d at 1188 (noting that "[t]his is one of those instances in which the dissent clearly tells us what the law is not"). Accordingly, *Inter Tribal* lends Secretary Kobach no succor regarding the plain statement rule's applicability. Ultimately, even if the plain statement rule were doctrinally independent and applicable—apart from the presumption against preemption—(which it is not) we would still decline to apply the plain statement rule for the same reason that the Supreme Court and our court have refused to apply the

36

We also reject Secretary Kobach's argument that preemption of Kansas's DPOC law cannot be inferred because the NVRA's express terms are silent as to whether states may impose a DPOC requirement. Were we to adopt such interpretive reasoning, we would upset the relationship that our Constitution establishes between the state and federal governments regarding regulation of congressional elections. States, rather than Congress, would have the power to "alter" or build on congressional regulations, rather than the other way around. The Elections Clause clearly does not contemplate such an eventuality: it empowers Congress to displace or alter state regulations governing the procedures for congressional elections.

Having rejected the heightened interpretive principle advanced by Secretary Kobach—the plain statement rule—we examine the plain meaning of the NVRA and apply the canons of construction as we ordinarily would to determine whether the NVRA's minimum-information principle preempts Kansas's DPOC requirement. We examine the Kansas statute and then the NVRA, cognizant that conflicting state provisions are preempted.

### 3. NVRA Requirements for State Motor Voter Forms

Here, the relevant Kansas statute provides: "The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship," and it enumerates thirteen forms of documentation, including a

presumption in this Elections Clause context.

37

birth certificate and a passport, that meet this requirement. Kan. Stat. Ann. § 25-2309(*l*).

The NVRA provisions at issue are in section 5, specifically subparagraphs (c)(2)(B) and (C). The relevant statutory language reads:

> (2)     The voter registration application portion of an application for a State motor vehicle driver's license—
>
>          . . . .
>
> (B)     may require only the minimum amount of information necessary to—
>
> > (i)      prevent duplicate voter registrations; and
> >
> > (ii)     enable state election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
>
> (C)     shall include a statement that—
>
> > (i)      states each eligibility requirement (including citizenship);
> >
> > (ii)     contains an attestation that the applicant meets each such requirement; and
> >
> > (iii)    requires the signature of the applicant, under penalty of perjury;

52 U.S.C. § 20504(c)(2). By their express terms, these subparagraphs have related but distinct meanings. Absent a convincing argument to the contrary, "may" should be "construed as permissive and to vest discretionary power," *United States v. Bowden*, 182 F.2d 251, 252 (10th Cir. 1950), while "shall" should be construed as "mandatory," *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1346 (10th Cir. 1992). Each provision restricts the discretion of states in fashioning the motor voter form in unique ways that are consistent with this permissive-mandatory distinction.

More specifically, subparagraph (B) serves to restrict what states "may" do—restricting states' discretion in creating their own DMV voter-registration forms by establishing the statutory minimum-information principle. *See* § 20504(c)(2)(B). This principle establishes a ceiling on what information the states can require. Understanding the nature of this limit on state discretion begins with an examination of the meaning of the term "minimum."

"If the words of the statute have a plain and ordinary meaning, we apply the text as written. We may consult a dictionary to determine the plain meaning of a term." *Fruitt v. Astrue*, 604 F.3d 1217, 1220 (10th Cir. 2010) (quoting *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir.2009)). Dictionaries agree on the meaning of "minimum": "Of, consisting of, or representing the lowest possible amount or degree permissible or attainable," AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1150 (3d ed. 1992); "Of, relating to, or constituting the smallest acceptable or possible quantity in a given case," *Minimum*, BLACK'S LAW DICTIONARY (10th ed. 2014); "smallest or lowest," THE NEW OXFORD ENGLISH DICTIONARY 1079 (2d ed. 2005); "of, relating to, or constituting a minimum: least amount possible," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1438 (1961).

Notably, this is in contrast to NVRA section 9, which was at issue in *Inter Tribal* and *EAC*. Section 5 establishes a stricter principle than that applied in *Inter Tribal* and *EAC* under section 9. Under NVRA section 5, a state motor voter form "may require only the *minimum* amount of information necessary" for state officials to carry out their

39

eligibility-assessment and registration duties. § 20504(c)(2)(B). But section 9 states that, as to the Federal Form, the EAC "may require only such identifying information . . . as is necessary" for state officials to meet their eligibility-assessment and registration duties.[11] § 20508(b)(2). Because we must, if possible, give effect "to every clause and word" of a statute, *Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006), we hold that section 5's "only the minimum amount of information necessary" is a stricter principle than section 9's "such identifying information . . . as is necessary." By adding "minimum," Congress intended to restrain the discretion of states more strictly than it restrains the EAC's discretion in composing the Federal Form. Accordingly, states do not enjoy the

---

[11] The relevant portion of section 9, § 20508(b), states:

The mail voter registration form developed under subsection (a)(2)—

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that—

(A) specifies each eligibility requirement (including citizenship);

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

40

same breadth of discretion as the EAC to require DPOC, *see Inter Tribal*, 133 S. Ct. at 2259–60—a higher burden must be met before a state may require DPOC for its motor voter form.

We reject Secretary Kobach's argument to the contrary. Secretary Kobach takes the position that the principle established in subparagraph (B) of section 5 is no different than that of section 9 because the former's "only the minimum amount of information necessary" and the latter's "only such . . . information . . . as is necessary" mean "substantially the same thing." Aplt.'s Opening Br. 34. Accordingly, under his view, states should enjoy the same discretion accorded to the EAC under *Inter Tribal* to require DPOC. The similarity of the language between section 5 and section 9 is undeniable. Adopting Secretary Kobach's reading, however, would make surplusage of section 5's term "minimum"—something we cannot do. *See Toomer*, 443 F.3d at 1194.

Additionally, this reading logically relies on the premise that "necessary" here means "necessary" in the strictest, most demanding sense, such that the addition of the term "minimum" would not further restrict, in the section 5 context, the amount of information that the state could add to the motor voter form. We do recognize that some dictionaries define the term "necessary," at least among other ways, in this rigorous sense. *See, e.g.*, WEBSTER'S, *supra*, at 1510–11 (in defining the term "necessary" stating "that must be by reason of the nature of the thing . . . that cannot be done without: that must be done or had: absolutely required: essential, indispensable"). However, dictionaries also recognize that in common parlance "necessary" can mean something less. *See, e.g.*,

41

*Necessary*, BLACK'S LAW DICTIONARY, *supra* ("1. That is needed for some purpose or reason."); THE NEW OXFORD AMERICAN DICTIONARY, *supra*, at 1135 (observing in a usage note that "Necessary applies to something without which a condition cannot be fulfilled . . . although it generally implies a pressing need rather than absolute indispensability"). This is not a linguistic nuance without legal application.

In this regard, the courts also have frequently interpreted "necessary" to mean something less than absolute necessity—most famously in *M'Culloch v. Maryland*:

> Is it true, that this is the sense in which the word "necessary" is always used? Does it always import an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. . . . It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies. The word 'necessary' is of this description. It has not a fixed character, peculiar to itself. It admits of all degrees of comparison; and is *often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports*. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed by these several phrases. The comment on the word is well illustrated by the passage cited at the bar, from the 10th section of the 1st article of the constitution. It is, we think, impossible to compare the sentence which prohibits a state from laying "imposts, or duties on imports or exports, except what may be *absolutely* necessary for executing its inspection laws," with that which authorizes congress "to make all laws which shall be necessary and proper for carrying into execution" the powers of the general government, without feeling a conviction, that the convention understood itself to change materially the meaning of the word "necessary," by prefixing the word "absolutely." This word, then, like others, is used in various senses; and, in its construction, the

42

subject, the context, the intention of the person using them, are all to be taken into view.

17 U.S. (4 Wheat.) 316, 414–15 (1819) (emphasis added); *see also United States v. Comstock*, 560 U.S. 126, 134 (2010) ("Chief Justice Marshall emphasized that the word 'necessary' does not mean 'absolutely necessary.'"); *In re Mile Hi Metal Sys., Inc.*, 899 F.2d 887, 893 (10th Cir. 1990) (interpreting "necessary" in the context of when a debtor-in-possession may reject a collective bargaining agreement under the bankruptcy code and observing that "[t]he word 'necessary' in subsection (b)(1)(A) does not mean absolutely necessary"); *Nat. Res. Def. Council, Inc. v. Thomas*, 838 F.2d 1224, 1236–37 (D.C. Cir. 1988) ("But courts have frequently interpreted the word 'necessary' to mean less than absolutely essential . . . .").

Following Chief Justice Marshall's observation that "necessary" is frequently qualified so as to add to or detract from its urgency, we reject Secretary Kobach's argument that Congress intended no difference between "minimum . . . necessary" and a bare, unadorned "necessary."[12]  As in the Constitution, with its prohibition of state

---

[12]      Secretary Kobach also argues that Congress used the term "minimum" in section 5, in order to establish subparagraph (c)(2)(B)(i)'s prohibition on requiring more than the minimum necessary to prevent duplicate voter registrations.  According to this argument, states could otherwise determine how much additional information to require depending on how thoroughly they wished to prevent duplicate registrations.  This contention is readily rebutted by the plain meaning of the statute and its structure.  The language "minimum amount of information necessary to" lies in subparagraph (c)(2)(B) and applies to both of the clauses that fall underneath it: both the duplicate voter-registration clause, (c)(2)(B)(i), and the clause dealing with state officials' eligibility-assessment and registration duties, (c)(2)(B)(ii).  Adopting Secretary Kobach's suggested reading would contradict this plain reading of the statute.

43

imposts and duties except as "absolutely necessary" for inspection laws, U.S. CONST. art. I, § 10, cl. 2, and the "necessary" of "necessary and proper," *id.* art. I, § 8, cl. 18, in the NVRA Congress distinguished between "minimum . . . necessary," § 20504(c)(2)(B) and merely "necessary," § 20508(b)(1). Giving meaning to the term "minimum," we reject Secretary Kobach's argument that the two are identical in meaning. The term "minimum" contemplates the least possible amount of information. We now turn to the attestation requirement and its relationship with the minimum-information principle.

Subparagraph (C) restricts state discretion in a distinct way from subparagraph (B)'s minimum-information principle. Specifically, it commands states to list qualifications and also to require applicants to attest that they meet them and to sign the attestation under penalty of perjury. *See* § 20504(c)(2)(C). Given the important discretion-limiting effects of these two subparagraphs on state power relative to federal elections, it is essential that we inquire further into the relationship between them to discern whether Kansas's DPOC law conflicts with section 5 of the NVRA. It is well settled that we are obliged to construe cognate statutory provisions harmoniously, if possible. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (citations omitted) (quoting, respectively, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959))); *Pharmanex v. Shalala*, 221 F.3d 1151, 1154 (10th Cir. 2000) (same); *In re Harline*, 950 F.2d 669, 675 (10th Cir. 1991) ("[F]ollowing the

44

rule that, whenever possible, statutes should be read in harmony and not in conflict . . . ." (quoting *Shumate v. Patterson*, 943 F.2d 362, 365 (4th Cir. 1991))).

With the foregoing guidance in mind, recall, on the one hand, that the statutory minimum-information principle of subparagraph (B) calls on states to include the least possible amount of information necessary on the motor voter form and, on the other, that subparagraph (C) *mandates* that states include an attestation requirement on that form. § 20504(c)(2)(B)–(C). Reading these two provisions harmoniously—as we must—we may safely proceed on the premise that the attestation requirement of subparagraph (C) does not violate in any instance the minimum-information principle of subparagraph (B). Otherwise, we would be forced to contemplate the absurdity of Congress providing a statutory principle in one breath and immediately violating it in the next. *See Levy's Lessee v. McCartee*, 31 U.S. (6 Pet.) 102, 111 (1832) (Story, C.J.) ("In any other view of the matter, this extraordinary consequence would follow, that the legislature could solemnly perform the vain act of repealing, as statutes, what, in the same breath, it confirmed as the common law of the state; that it would propose a useless ceremony; and by words of repeal would intend to preserve all the existing laws in full force. . . . [I]t would be unintelligible and inconsistent with a design to retain them all as a part of its own common law."); *Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998) ("[I]t is inconceivable to us that Congress would in the same breath expressly prohibit discrimination in fringe benefits, yet allow employers to discriminatorily deny or limit post-employment benefits to former employees who ceased to be 'qualified' at or after

45

their retirement, although they had earned those fringe benefits through years of service in which they performed the essential functions of their employment."); *see also Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006) ("[I]t would be contradictory for Congress in the same breath to expressly make assets subject to execution and at the same time make the owner of those assets immune from suit to recover those assets."). That thought we will not entertain. The attestation requirement, in our view, cannot contravene or overstep the minimum-information principle, but we do recognize that in a given case it may not be sufficient for a state to carry out its eligibility-assessment and registration duties.

The minimum-information principle does not operate in a vacuum. It directly pertains to whether states are able to carry out their eligibility-assessment and registration duties in registering qualified applicants to vote. In other words, the NVRA expressly contemplates that states will undertake these duties using the motor voter form in registering applicants to vote, but it limits their discretion to request information for this purpose to the minimum amount of information necessary. With the harmonious relationship between subparagraphs (B) and (C) in mind, we do believe that section 5 is reasonably read to establish the attestation requirement as the presumptive minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties; as a result of a state carrying out these duties, qualified applicants gain access to the franchise.

46

In this regard, Congress has historically relied on an attestation requirement "under penalty of perjury" as a gate-keeping requirement for access to a wide variety of important federal benefits and exemptions.[13] *See, e.g.*, 7 U.S.C. § 2020(e)(2)(B)(v) (requiring state applications for Supplemental Nutrition Assistance Program aid be signed under penalty of perjury as to the truth of the information contained in the application and the citizenship or immigration status of household members); 26 U.S.C. § 6065 (requiring that any tax "return, declaration, statement, or other document" be "verified by a written declaration that it is made under the penalties of perjury"); 42 U.S.C. § 1395w-114(a)(3)(E)(iii)(I) (requiring "an attestation under penalty of perjury" as to assets for receipt of prescription drug plan subsidies); 42 U.S.C. § 1436a(d)(1)(a) (requiring an attestation of citizenship or "satisfactory immigration status" for the receipt of housing assistance); *United States v. Garriott*, 338 F. Supp. 1087, 1097 (W.D. Mo. 1972) (noting that the military's Form 150, accompanied by a conscientious objector certificate, is "executed by the registrant under pain of perjury"); *cf.* 45 C.F.R. § 206.10(a)(1)(ii) (requiring that application forms for various state-administered welfare

---

[13] Kansas, too, once depended on an attestation requirement for such a function. Prior to enacting its DPOC requirement, Kansas's voter-registration statute tracked the requirements of the NVRA in relying on attestation for eligibility verification. *Compare* Kan. Stat. Ann. § 25-2309 (2001), *with* Kan. Stat. Ann. § 25-2309 (Supp. 2015) (including the DPOC requirements in section (*l*) added by the SAFE Act, 2011 Kan. Sess. Laws 795). And, even after the institution of the DPOC regime, Kansas recognizes that the attestation requirement can play a role—albeit a limited one—in ensuring that only citizens are registered to vote. *See*, *e.g.*, Aplt.'s App., Vol. 3, at 711–14 (evincing Secretary Kobach's admission that attestation before the state election board would suffice where documentary proof is unavailable).

programs be signed "under a penalty of perjury"); Official Bankruptcy Form B 101, Voluntary Petition for Individuals Filing for Bankruptcy, 11 U.S.C.A. (West) (requiring attestation under penalty of perjury as to the truth of the information provided to file for bankruptcy); Official Form DS-11, Application for a U.S. Passport, http://www.state.gov /documents/organization/212239.pdf (requiring signed attestation under pain of perjury). Therefore, it is entirely reasonable for us to infer from the statutory structure that Congress contemplated that the attestation requirement would be regularly used and would typically constitute the minimum amount of information necessary for state officials to carry out their eligibility-assessment and registration duties—more specifically, their duties to register qualified applicants to vote.

Put another way, we interpret section 5 as establishing the attestation requirement in every case as the *presumptive* minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties. But whether the attestation requirement actually satisfies the minium-information principle in a given case turns on the factual question of whether the attestation requirement is sufficient for a state to carry out these duties. Thus, we go no further than to say that the attestation requirement *presumptively* satisfies the minimum-information principle: nothing in the statute suggests that a state cannot rebut that presumption in a given case by demonstrating that the attestation requirement is insufficient for it to carry out its eligibility-assessment and registration duties. In other words, we do not conclude here that section 5 prohibits states from requiring DPOC in all circumstances and without exception. However, guided by

48

*Inter Tribal* and our decision in *EAC*, we hold that in order for a state advocating for a DPOC regime to rebut the presumption that the attestation requirement is the minimum information necessary for it to carry out its eligibility-assessment and registration duties, it must make a factual showing that the attestation requirement is insufficient for these purposes. *See EAC*, 772 F.3d at 1195.

We believe that construing section 5 to permit states to rebut the presumptive sufficiency of the attestation requirement is in keeping with *Inter Tribal* and our precedent. In *Inter Tribal*, the Court reasoned that if the NVRA prevented a state from acquiring the information necessary to enforce its qualifications to vote—notably, citizenship—it would raise a serious constitutional concern. 133 S. Ct. at 2258–59. But the Court also observed that states have the opportunity to petition the EAC to add state-specific instructions requiring DPOC and—in the event of an EAC refusal—the opportunity to "establish in a reviewing court that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include [DPOC]." *Id.* at 2259–60. Of course, Congress did not entrust an administrative agency like the EAC with the interpretation of the requisite content for state motor voter forms. However, the provisions governing the content of the Federal Form (i.e., section 9 of the NVRA) and state motor voter forms are analogous. And thus just as the *Inter Tribal* Court construed the requirements of section 9 to avoid constitutional doubt by giving states the opportunity—after failing to obtain relief from the EAC—to obtain state-specific, DPOC instructions by making a factual showing to a

49

court that the attestation requirement ("a mere oath") is not sufficient, 133 S. Ct. at 2260, we construe the analogous provisions of section 5 as also permitting states to rebut the presumption that the attestation requirement of subparagraph (C) satisfies the minimum-information principle in a particular case.[14]

More specifically, in order to rebut the presumption as it relates to the citizenship criterion, we interpret the NVRA as obliging a state to show that "a substantial number of noncitizens have successfully registered" notwithstanding the attestation requirement. *EAC*, 772 F.3d at 1198. In *EAC*, we held that the EAC was not under a nondiscretionary duty to add state-specific DPOC instructions to the Federal Form at two states' behest. 772 F.3d at 1196. We reached this conclusion because "[t]he states have failed to meet their evidentiary burden of proving that they cannot enforce their voter qualifications because a substantial number of noncitizens have successfully registered using the Federal Form." *Id.* at 1197–98. The failure to make such an evidentiary showing was seemingly dispositive there of Secretary Kobach's Qualifications Clause challenge.

---

[14] Whether this step would be dispositive regarding the use of DPOC appears to be an open question. Should a state advocating for a DPOC regime succeed in showing in a given case that the attestation requirement does not satisfy the minimum-information principle, we would be faced with a question not confronted by the courts in *Inter Tribal* and *EAC*: Does it ineluctably follow that DPOC should be adjudged adequate to satisfy this principle? It is logically conceivable that something more than attestation but less burdensome than requiring DPOC could be sufficient, which would preclude requiring DPOC. Thus, a two-step analysis would be required: first a state would bear the burden of showing that attestation falls below the minimum necessary to carry out its eligibility-assessment and registration duties and then, second, it would need to show that nothing less than DPOC is sufficient to meet those duties. Because Secretary Kobach fails to make a sufficient showing on this possible first step of the analysis, we have no need to opine definitively on whether the NVRA mandates satisfaction of a second step.

Here, we of course are concerned with the statutory principle established by subparagraph (B) of section 5 rather than the Qualifications Clause. And we do recognize that the questions asked under this principle and the Qualifications Clause are linguistically distinct and therefore do not inexorably call for exactly the same analysis. *Compare Inter Tribal*, 133 S. Ct. at 2258–59 ("[I]t would raise serious constitutional doubts if a federal statute *precluded a State from obtaining the information necessary to enforce its voter qualifications.*" (emphasis added)), *with* § 20504(c)(2)(B) ("[M]ay require only *the minimum amount of information necessary to . . . assess the eligibility of the applicant and to administer voter registration and other parts of the election process*" (emphasis added)). However, these questions are sufficiently similar that it seems logical to apply a similar proof threshold to them. And Secretary Kobach has not argued to the contrary.

Thus, we hold that to overcome the presumption that attestation constitutes the minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties, the state must show that a substantial number of noncitizens have successfully registered to vote under the attestation requirement. This results in the preemption analysis here being quite straightforward: if Kansas fails to rebut this presumption that attends the attestation regime, then DPOC necessarily requires more information than federal law presumes necessary for state officials to meet their

51

eligibility-assessment and registration duties (that is, the attestation requirement).

Consequently, Kansas's DPOC law would be preempted.[15]

i.     **The NVRA Does Not Conclusively Bar State DPOC Requirements in the Motor Voter Process**

Among other arguments for affirming the district court, both Plaintiffs-Appellees and amicus Common Cause contend that the NVRA conclusively forecloses states from requiring DPOC. In other words, they read section 5's attestation requirement—found in subparagraph (C)—as satisfying in every instance the minimum-information principle of subparagraph (B), *viz.*, as constituting in every instance the minimum amount of information necessary for states to carry out their eligibility-assessment and registration duties. This argument fails because it requires a strained reading of the plain text of the statute and risks making surplusage of the minimum-information principle.

---

[15]     The requirements for the content of motor voter forms and the Federal Form differ, and thus it should not be surprising that the analysis applied here to a challenge to a DPOC requirement in the setting of a state motor voter form differs somewhat from the analysis we employed in the Federal Form context in *EAC* with regard to the requested state-specific DPOC requirement. There, in evaluating whether the EAC's decision was arbitrary and capricious, we noted that the agency decision had discussed five non-DPOC alternatives to ensure that noncitizens do not register using the Federal Form. *EAC*, 772 F.3d at 1197. Here, however, we need to consider only one alternative because, notably, the principle established by Congress for state motor voter forms is stricter than the one that guides the EAC's determination of whether to include a state-specific DPOC requirement on the Federal Form. As we held *supra*, section 5 sets a stricter principle than the "necessary" principle of section 9. Under this more rigorous principle, it is unnecessary to consider alternatives other than the presumptive minimum amount necessary—the attestation requirement. If Kansas fails to rebut Congress's presumptive conclusion that the attestation requirement satisfies the minimum-information principle, then DPOC necessarily requires more than federal law authorizes (i.e., attestation); accordingly, Kansas's DPOC law would be preempted.

Although these provisions are related, and subparagraph (C) cannot be interpreted as running afoul of subparagraph (B), that does not mean that Congress intended that subparagraph (C) exclusively particularize or instantiate the principle set out in subparagraph (B). Congress did not expressly establish a relationship of definition or elaboration between subparagraphs (B) and (C)—though it knows how to craft such a textual relationship; this suggests to us that Congress did not intend to create such a relationship. When Congress knows how to achieve a specific statutory effect, its failure to do so evinces an intent *not* to do so. *See, e.g.*, *United States v. Burkholder*, 816 F.3d 607, 615 (10th Cir. 2016) ("Congress clearly knew how to add a proximate-cause requirement in criminal penalty-enhancement statutes when it wished to do so. That it nevertheless did not do so in § 841(b)(1)(E) is thus very telling; indeed, it suggests that Congress intended to omit a proximate cause requirement . . . .").

More specifically, Congress knows how to draft a provision that specifies or elaborates on a more general statutory standard. For example, in Chapter 11 of the Bankruptcy Code, Congress requires that when a class of creditors or interests has rejected a reorganization plan, the plan must meet a variety of requirements to be confirmed, including that the plan be "fair and equitable" towards impaired classes that rejected the plan. 11 U.S.C. § 1129(b)(1). Congress then specifies requirements to meet the fair and equitable standard: "For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements[.]"

§ 1129(b)(2). Then specific requirements are set out for classes holding secured claims, unsecured claims, or other interests. *See* § 1129(b)(2)(A)–(C).

Similarly, Congress knows how to define with specificity key statutory terms. For instance, the Dodd-Frank Act defines the terms "systemically important" and "systemic importance"—concepts essential to that regulatory regime. 12 U.S.C. § 5462(9) ("The terms 'systemically important' and 'systemic importance' mean a situation where the failure of or a disruption to the functioning of a financial market utility or the conduct of a payment, clearing, or settlement activity could create, or increase, the risk of significant liquidity or credit problems spreading among financial institutions or markets and thereby threaten the stability of the financial system of the United States."). Moreover, in a context nearer to the present one, the Voting Rights Act (the "VRA") defines the term "test or device," which is frequently used throughout that statute: "The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting [meet one of four kinds of requirements]." 52 U.S.C. § 10303(c).

But, in the NVRA, Congress did not expressly elaborate on or define subparagraph (B)'s minimum-information principle, much less do so in a manner indicating that the principle equates (in every instance) to the attestation requirement of subparagraph (C). *See* 52 U.S.C. § 20504(c)(2). In our view, this omission strongly suggests a congressional intention not to equate in every instance the statutory minimum-information principle with the attestation requirement.

54

This reading is further supported by the punctuation that separates the two provisions. In interpreting these provisions, we must "account for a statute's full text, language as well as punctuation, structure, and subject matter." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993). Here, subparagraphs (B) and (C) are set off from one another by semicolons. *See* § 20504(c)(2). The semicolons accentuate the independent nature of each provision in the statute's structure—signaling that they are separate by congressional design. *See United States v. Republic Steel Corp.*, 362 U.S. 482, 486 (1960) (concluding that a provision is separate and distinct where it was followed by a semicolon and another provision). While we are certainly not slaves to punctuation where its use defies the "natural meaning of the words employed," *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 83 (1932), its use here serves to further clarify the statute's meaning, and should therefore be "accorded appropriate consideration." *See Haskell v. United States*, 241 F.2d 790, 792 (10th Cir. 1957).[16]

Reading subparagraph (C) as exhaustively particularizing subparagraph (B) would effectively render the latter surplusage. Yet, we must attempt to "give effect, if possible, to every word of the statute." *Quarles v. United States ex rel. BIA*, 372 F.3d 1169, 1172 (10th Cir. 2004). And interpreting subparagraph (C) as defining or exclusively particularizing subparagraph (B)'s minimum-information principle—in the absence of

---

[16] But, at the same time, as evident from our analysis *supra*, the two provisions are only separated by a semicolon—rather than, say, a period—and also share a common "parent" provision (i.e., § 20504(c)(2)); this suggests that they are in fact interrelated and should be construed in a harmonious manner if possible.

55

any explicit direction from Congress that the two provisions should be so read—fails to give independent "operative effect" to the diverse language used in the two subparagraphs. *See Finley v. United States*, 123 F.3d 1342, 1347 (10th Cir. 1997). The reading of the statute that we adopt has the beneficial effect of avoiding this outcome: under it, subparagraph (C)'s attestation requirement does no more than *presumptively* satisfy the minimum-information principle of subparagraph (B); it is not coterminous with or an exclusive particularization of this principle. A state still may seek to rebut the presumption—*viz.*, to establish that the attestation requirement is not the minimum amount of information necessary to carry out its eligibility-assessment and registration duties.

By following this interpretive path, we also are adopting the reading that best avoids even a shadow of constitutional doubt and should permit courts to largely avoid the constitutional question of whether the NVRA runs afoul of the Qualifications Clause. "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)). Although we do not invoke the constitutional doubt canon to choose among plausible alternative readings, we may nonetheless employ it to buttress our plain reading of the NVRA. *See Marx v. Gen. Revenue Corp*, 133 S. Ct. 1166, 1181 (2013) ("Because the text is plain, there is no need to proceed any further. Even so, relevant canons of statutory interpretation lend added support . . . ."). The constitutional doubt canon "is

56

followed out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Almendarez-Torres*, 523 U.S. at 238 (quoting *Rust v. Sullivan*, 500 U.S. 173, 191 (1991)).

Were we to adopt the reading that, in every instance, the attestation requirement is all that a state may ever mandate in the motor voter application context, no flexibility would remain for states to make a *statutory* showing that something more is necessary—only a constitutional challenge would remain. We find it implausible that Congress would intend to adopt a requirement (and to adopt it so unclearly) under which states are forced to resort exclusively to constitutional challenges in order to protect their Qualification Clause powers and related interests. First, such a result would run counter to the presumption underlying the constitutional-doubt canon–i.e., that Congress legislates within the limits set down for it in the Constitution. Second, such an interpretation would force a court to reach the Qualifications Clause question whenever a state wished to require something more than attestation.

Our reading of section 5 of the NVRA—like the Supreme Court's reading of section 9 in *Inter Tribal*, 133 S. Ct. at 2259–60 (relying on recourse to the EAC and judicial review to avoid constitutional doubt)—provides an escape valve. States may respond to a challenge to a DPOC requirement with a showing that attestation is insufficient under the statute. That is to say, there is conceivably room in the NVRA's minimum-information principle for more than just attestation. Thus, challenges to DPOC can be decided, where appropriate, on statutory grounds—permitting the courts to largely

57

avoid resolving the merits of constitutional questions, such as the Qualifications Clause issue. These considerations lend further support to the reading we adopt and undercut the reading that the NVRA conclusively forecloses the use of DPOC. Having dispensed with that extreme interpretation of the statute, we turn now to erroneous ones advanced by Secretary Kobach.

### ii. Secretary Kobach's Readings of the Statute Are Unavailing

Secretary Kobach argues that the district court erred in interpreting the NVRA in a variety of ways. First, he argues that "necessary" means "what is necessary under state law" such that the states are the final arbiters of what is necessary to meet the minimum-information principle. Second, Secretary Kobach argues that the statute's requirements apply only to information on the motor voter form itself and therefore do not preclude the imposition of a DPOC requirement because DPOC is not information written on the form. Third, he argues that *Young v. Fordice*, 520 U.S. 273 (1997), holds that the NVRA does not constrain what states may request of applicants. Finally, he argues that it is absurd to construe the motor voter requirements as establishing a standard different from that established for the Federal Form or agency registration requirements.

Secretary Kobach argues that "the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," § 20504(c)(2)(B), means essentially "what is necessary under state law." In particular, he argues that this is

58

the "natural reading of 'administering voter registration and other parts of the election process,'" because what is necessary for administering voter registration and the election process is determined by state law. Aplt.'s Opening Br. 32. We reject this argument because the Supreme Court in *Inter Tribal* rejected such an understanding of federal election regulation and confirmed that the NVRA's plain language evinces Congress's intent to restrain the regulatory discretion of the states over federal elections, not to give them free rein.

The notion that the NVRA "lets the States decide for themselves what information 'is necessary'" was Justice Alito's position in his dissent in *Inter Tribal*, 133 S. Ct. at 2274 (Alito, J., dissenting) (quoting statutory text currently found at 52 U.S.C. § 20508). The majority rejected that position and held that the NVRA requires states to register voters who provide a valid Federal Form. *Id.* at 2255–56 (majority opinion). Although *Inter Tribal* dealt with a different section of the NVRA, the same reasoning applies here. The NVRA creates a federal regime intended to guarantee "that a simple means of registering to vote in federal elections will be available." *Id.* at 2255. Allowing the states to freely add burdensome and unnecessary requirements by giving them the power to determine what is the "minimum amount of information necessary" would undo the very purpose for which Congress enacted the NVRA. Drawing on our reasoning in *EAC*, we may similarly conclude that "the dissent [of Justice Alito] clearly tells us what the law is not," *EAC*, 772 F.3d at 1188; consequently, Secretary Kobach's argument here is legally untenable.

59

Secretary Kobach next argues that the limitations of section 5 of the NVRA—most saliently, the minimum-information principle—only define the scope of the information that can appear on the motor voter form itself. As his argument goes, because Kansas's DPOC requirement does not appear on the motor voter form and does not involve a supplemental request for form information, the DPOC requirement does not run afoul of section 5's restraints. However, Secretary Kobach points to nothing in the statute's text that indicates that the minimum-information principle does not extend beyond the four corners of the motor voter form. Indeed, as we see it, Secretary Kobach simply seeks to repackage here his failed argument that, as long as Congress is silent in the NVRA's express terms regarding DPOC, Kansas may tack onto the NVRA's regulatory scheme a DPOC requirement, without conflicting with that scheme. But, as we have noted *supra*, such an argument rests on an erroneous understanding of the relationship established between the states and Congress by the Elections Clause. And it would involve applying the presumption against preemption or the plain statement rule; doing so, however, would be improper here.

Our rejection of Secretary Kobach's reading of the statute is also supported by *Inter Tribal*'s reasoning. There, Arizona argued that the NVRA "requires merely that a State receive the Federal Form willingly and use that form as one element in its (perhaps lengthy) transaction with a prospective voter." *Inter Tribal*, 133 S. Ct. at 2254. But subparagraph (B) of section 8 of the NVRA in the Federal Form context requires states to register applicants who have submitted "valid voter registration form[s]" within a period

60

of no less than 30 days before the election. *See* § 20507(a)(1)(B). The Court reasoned that Arizona's ability to reject a Federal Form unaccompanied by DPOC could only be "squared"with its short-time-fuse registration obligation under section 8—i.e, 30 days or less—if the completed form could be deemed not a "valid voter registration form" because of the absence of the DPOC required by state law. 133 S. Ct. at 2255. The court discussed the EAC's role in crafting the form and concluded that it was "improbable" that the completed form was not valid standing alone because the statute "takes such pains to create" the form. *Id.*

Secretary Kobach's argument that the NVRA does not prevent states from requiring additional documentation not on the motor voter form creates a similar squaring problem to the one present in *Inter Tribal*. A provision of section 8 of the NVRA that is analogous to the one at issue in *Inter Tribal* governs the states' obligations in the motor voter context to register applicants who submit valid voter-registration forms, up to thirty days prior to the election. Specifically, subparagraph (A) requires states to "ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant is submitted . . . not later than the lesser of 30 days, or the period provided by State law, before the date of the election." § 20507(a)(1)(A). While we recognize that the present case is distinct from *Inter Tribal* insofar as the creation of motor voter forms is entrusted to the state, § 20504(c)(1), and not the EAC, Congress has carefully crafted the motor voter form requirements and has restricted states to requesting the least possible amount of information necessary to effect their eligibility-assessment

61

and registration duties. And, as in the Federal Form context, Congress has imposed on the states a short-time-fuse registration obligation, presumably with an interest in ensuring that the public has ready access to the franchise, *see* § 20501(b) (1) ("establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office").

Given these circumstances, we find it "improbable," *Inter Tribal*, 133 S. Ct. at 2255, that Congress would envision that the states could routinely deem a motor voter form to be the starting place in a more elaborate state registration scheme that required the presentation of DPOC, where the inescapable effect of this approach would be (1) to render the motor voter form—the requirements of which Congress carefully limited to the least amount of information necessary—an invalid voter-registration form because it is not accompanied by DPOC, and (2) to shut polling-place doors on citizens who have submitted otherwise valid motor voter forms. Thus, *Inter Tribal*'s reasoning bolsters our conclusion that Secretary Kobach's argument that the NVRA does not prevent states from requiring additional documentation not on the motor-voter form is untenable and misguided.

Furthermore, the fact that Congress spoke only to requiring information on the motor voter form tends to cut against rather than in favor of Secretary Kobach's approach. The omission of requirements for, or prohibitions on, other documents that states might require does not suggest that states may require anything that they desire to facilitate the registration process beyond the form itself. To the contrary, it suggests by

62

the negative-implication canon, *expressio unius est exclusio alterius*, that Congress

intended that the motor voter form would—at least presumptively—constitute the

beginning and the end of the registration process. *See,* e.g., *Marx*, 133 S. Ct. at 1181

("[W]hen Congress includes one possibility in a statute, it excludes another by

implication.").[17]

Third, Secretary Kobach argues that *Young v. Fordice* held that the NVRA places

no restrictions on what a state may require in the motor voter registration process. The

relevant language from *Young* states:

> In saying this, we recognize that the NVRA imposes certain mandates on States, describing those mandates in detail. The NVRA says, for example, that the state driver's license applications must also serve as voter registration applications and that a decision not to register will remain confidential. It says that States cannot force driver's license applications to submit the same information twice (on license applications and again on registration forms). Nonetheless, implementation of the NVRA is not purely ministerial. The NVRA still leaves room for policy choice. *The NVRA does not list, for example, all the other information the State may—or may not—provide or request.* And a decision about that other information—say, whether or not to tell the applicant that registration counts only for federal elections—makes Mississippi's changes to the New System the kind of discretionary, nonministerial changes that call for federal VRA review. Hence, Mississippi must preclear those changes.

---

[17]     Although we have decided this case on the basis of the plain text of the statute, we may nonetheless use the canons to buttress our adopted reading and to reject Secretary Kobach's reading. *See Marx*, 133 S. Ct. at 1181 ("Because the text is plain, there is no need to proceed any further. Even so, relevant canons of statutory interpretation lend added support to reading § 1692k(a)(3) as having a negative implication. . . .  [*Expressio unius*] reinforces what the text makes clear.").

*Young*, 520 U.S. at 286 (emphasis added) (citations omitted). This language—especially the italicized passage—cannot fairly be read as "indicat[ing] that there is *no* constraint in the NVRA over what additional documentation a State may request beyond the form itself." Aplt.'s Opening Br. 27. Instead, *Young* simply states that the NVRA does not comprehensively and specifically prescribe what may or may not be included on state motor voter forms and thus allows space for the states to exercise discretion regarding this matter; consequently, they must invoke the preclearance process under the VRA. 520 U.S. at 286 ("The NVRA does not list, for example, all the other information the State may—or may not—provide or request."). Put another way, *Young* is a VRA preclearance case from beginning to end. The Court's discussion of the NVRA occurs in the context of explaining why states that conform to the NVRA must nonetheless preclear planned changes—specifically, because room for potentially discriminatory policy choice remains. *See id. Young* says nothing about the minimum-information principle at issue here. And under no circumstances can it be read as giving the states *carte blanche* under the NVRA to fashion registration requirements for their motor voter forms. In short, *Young* is not on point.

Finally, Secretary Kobach argues that reading Section 5 to establish a standard different from that applied to the Federal Form or agency registration is absurd and so the district court erred in adopting such an interpretation. "The absurdity doctrine applies 'in only the most extreme of circumstances,' when an interpretation of a statute 'leads to results so gross as to shock the general moral or common sense,' which is a 'formidable

64

hurdle' to the application of this doctrine." *In re Taylor*, 737 F.3d 670, 681 (10th Cir.

2013) (quoting *United States v. Husted*, 545 F.3d 1240, 1245 (10th Cir. 2008)).  To

explicate the requirements of this rigorous doctrine is to answer the question here:

Secretary Kobach's absurdity argument must fail.  There is nothing absurd about

Congress creating a stricter principle—i.e., the minimum-information principle—to

govern the states in fashioning motor voter forms, which are the NVRA's central mode of

registration,[18] than the principle applicable to the other two forms of registration under the

statute.[19]   Even if one could reasonably say that Congress acted in an unusual manner in

failing to craft a uniform principle for the NVRA's three modes of registration (which one

cannot), this congressional slip-up would fall well short of "the most extreme of

circumstances" or engender a result "so gross as to shock the general moral or common

sense." *Taylor*, 737 F.3d at 681.  The absurdity doctrine thus finds no purchase here.

---

[18]        That Congress intended and understood the motor voter provisions as the center of the NVRA is reflected in Congress's treatment of section 7's agency provisions as a kind of gap filler to capture potential voters unlikely to go to the DMV.  H.R. REP. NO. 103-66, at 19 (1993) (Conf. Rep.) ("If a State does not include either public assistance, agencies serving persons with disabilities, or unemployment compensation offices in its agency program, it will exclude a segment of its population from those for whom registration will be convenient and readily available—the poor and persons with disabilities who do not have driver's licenses and will not come into contact with the other principle [sic] place to register under this Act."), *as reprinted in* 1993 U.S.C.C.A.N. 140, 144.

[19]        Secretary Kobach also asserts that there is no "minimum necessary" principle in section 7's agency registration requirements and that this is an example of the district court's absurd reading of the statute as requiring different standards under the NVRA's various programs.  But section 7 requires use of the Federal Form or the agency's own form if "it is equivalent to" the Federal Form.  § 20506(a)(6)(A).  Thus, the agency provisions rely on the same principle required for the Federal Form.

Having rejected Secretary Kobach's readings of the NVRA, we turn now to whether he put forward the required factual showing to overcome the presumption that the attestation requirement satisfies the minimum-information principle with respect to the state's eligibility-assessment and registration duties. To overcome the presumption, a state must show that a substantial number of noncitizens have successfully registered to vote under the attestation requirement.

**4. Kobach Fails to Rebut the Presumption that the Attestation Requirement Is the Minimum Amount of Information Necessary**

The district court found that between 2003 and the effective date of Kansas's DPOC law in 2013, only thirty noncitizens registered to vote—no more than three per year. Secretary Kobach was only able to show that fourteen noncitizens had attempted to register to vote in Sedgwick County, Kansas, since the enactment of the DPOC requirement.[20] These numbers fall well short of the showing necessary to rebut the presumption that attestation constitutes the minimum amount of information necessary for Kansas to carry out its eligibility-assessment and registration duties. Finally, as the district court pointed out in its order granting the preliminary injunction, Secretary Kobach conceded that the state election board will accept as sufficient proof of citizenship a declaration or affidavit from an applicant at a hearing under subsection (m)

---

[20] Of those fourteen cases, the district court found that twelve could have been avoided by better training at the DMV because those registrations resulted from misunderstandings of the eligibility requirements rather than intentional fraud.

of the SAFE Act.[21]  That concession, in our view, undermines the legitimacy of Secretary

       [21]      At the preliminary injunction hearing, when asked whether the state election board would accept as sufficient proof of citizenship the affirmation of an individual unable to otherwise provide DPOC, Secretary Kobach responded:

> [H]e can also make the allegation himself, too. He can file his own declaration. . . . *I would be willing to bet that the State Election Board would take simply his own declaration as sufficient.* The State Election Board has yet to tell anyone no. And that's perfectly fine if a person is willing to make an attestation, a declaration to the State Election Board, "Here are my circumstances, here's why I don't have my document."

*Fish v. Kobach*, 2016 WL 2866195, at \*5 (emphasis added); *accord* Aplt.'s App., Vol. V, at 1133–34 (providing transcribed comments of Secretary Kobach).  Based largely on these representations the district court found:

> The state election board is comprised of the Secretary of State, the Attorney General, and the Lieutenant Governor. Secretary Kobach represents that this hearing before the election board may be telephonic, that three people have so far availed themselves of this provision, and that all three were approved by the election board. Examples provided by Secretary Kobach of alternative forms of citizenship documentation under subsection (m) include an affidavit from a sibling stating the date and place of birth, school records, *or even an applicant's own affidavit.*

*Id.* (emphasis added).  The court further found that "[a]s an example of an acceptable form of DPOC under subsection (m) of the law, which may be triggered when an applicant is unable to obtain one of the thirteen forms of DPOC listed in subsection (*l*), Mr. Kobach suggested that a person's own declaration of citizenship would satisfy the state election board." *Id.* at \*22.

We recognize that Secretary Kobach's remarks on this matter at the preliminary injunction hearing are not pellucid.  They are amenable to more than one permissible reading.  In that regard, they could be reasonably read as indicating that an applicant's sworn affidavit or declaration of citizenship, while acceptable and important evidence of citizenship, could not fully satisfy the applicant's evidentiary burden; notably, there is some suggestion in Secretary Kobach's comments that an applicant might be required to explain his personal reasons for not being able to secure statutorily acceptable DPOC.  However, in finding that Secretary Kobach's comments amounted to a concession that the

Kobach's assertion that a written attestation on a motor voter registration form is insufficient to allow State officials to meet their eligibility assessment and registration duties.

Secretary Kobach does not appear to contest the district court's factual findings as to how many noncitizens registered or attempted to register to vote. Instead, he contests the conclusion to be drawn from those findings. Secretary Kobach argues that if even one noncitizen successfully registers under the attestation regime, then DPOC is necessary to ensure applicant eligibility. However, as we have already noted, "necessary" should not be understood in an absolute sense here. *See* Discussion *supra* Section II.C.3. Section 5 does not require whatever is strictly necessary to prevent even a single noncitizen from registering. Moreover, recall that in *EAC* we held that "to establish in a reviewing court that a mere oath will not suffice," 772 F.3d at 1197 (quoting *Inter Tribal*, 133 S. Ct. at 2260), the state has an "evidentiary burden of proving that they cannot enforce their voter qualifications because *a substantial number* of noncitizens have successfully registered." *Id.* at 1197–98 (emphasis added). Although the context there was the Federal Form and the Qualifications Clause, we have held here that the same rule applies. *See* Discussion *supra* Section II.C.3.

---

state election board would accept a sworn affidavit or declaration of citizenship as sufficient evidence "the district court made a choice between two permissible views of the evidence, and it is not our role to label this choice clearly erroneous." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 777 n.2 (10th Cir. 2009); *see Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

Moreover, it cannot be that, while intending to create a simplified form of registration for federal elections, Congress adopted such a malleable statutory principle (i.e., minimum information) that the states could effectively become the final arbiters of what is required under the NVRA by the simple expedient of claiming that one noncitizen managed to register to vote. Congress adopted the NVRA to ensure that whatever else the states do, "simple means of registering to vote in federal elections will be available." *Inter Tribal*, 133 S. Ct. at 2255. This purpose would be thwarted if a single noncitizen's registration would be sufficient to cause the rejection of the attestation regime. Indeed, under Secretary Kobach's "one is too many" theory, even the DPOC regime could conceivably be found to require less than the minimum information necessary,[22] allowing states to employ still harsher and more burdensome means of information gathering to prevent noncitizen registration. The NVRA does not require the least amount of information necessary to prevent even a single noncitizen from voting.

**5. Secretary Kobach Fails to Make the Showing Required by *Inter Tribal* to Raise Constitutional Doubt Under the Qualifications Clause**

In addition to challenging the district court's reading of the NVRA as being contrary to the statute, Secretary Kobach argues that the court's reading of the NVRA

---

[22] For example, our immigration laws—despite requiring documentary proof of identity and authorization to work in the United States—are frequently circumvented. *See, e.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 148 (2002) ("There is no dispute that Castro's use of false documents to obtain employment with Hoffman violated these provisions."). Even DPOC is unlikely to prevent a determined noncitizen from successfully registering to vote.

69

raises doubt as to the statute's constitutionality by preventing Kansas from exercising its constitutionally delegated power to enforce qualifications for congressional elections under the Qualifications Clause and the Seventeenth Amendment. He further argues that the court's interpretation would result in different qualifications for state and federal elections in Kansas, running afoul of the Qualifications Clause and the Seventeenth Amendment. Both arguments fail.

First, Secretary Kobach has failed to make any showing that the NVRA prevents Kansas from enforcing its qualifications. It is true that the states—not Congress—have the power to determine "*who* may vote in" elections. *Inter Tribal*, 133 S. Ct. at 2257. This includes the power "to enforce those requirements." *Id.* at 2258. But *Inter Tribal* held that no constitutional doubt was raised under the Qualifications Clause unless the NVRA "precluded a State from obtaining the information necessary to enforce its voter qualifications." 133 S. Ct. at 2259. In *EAC*, we deemed it determinative of whether Secretary Kobach had demonstrated such preclusion that he had failed to show that substantial numbers of noncitizens had registered to vote. 772 F.3d at 1197–98. Here, Secretary Kobach offers us nothing more than the meager evidence of noncitizens registering to vote that he proffered in connection with his statutory arguments *supra*—evidence that we deemed insufficient to show that substantial numbers of noncitizens had registered to vote. He does not contend that something about the Qualifications Clause preclusion standard should lead us to evaluate this evidence in a different light. Consequently, we reach the same conclusion of insufficiency as to his

70

evidentiary showing in the Qualifications Clause context. Thus, given this evidentiary failing, we need not engage in a constitutional doubt inquiry. *Id.* at 1996 (observing as to *Inter Tribal* and the constitutional doubt question that "[t]he Court did not have to resolve this potential constitutional question in [*Inter Tribal*], nor did it employ canons of statutory construction to avoid it, because such steps would only be necessary if Arizona could prove that federal requirements precluded it from obtaining information necessary to enforce its qualifications.").

Secretary Kobach also argues that the district court's decision creates separate qualifications for state and federal elections in Kansas, in violation of the Qualifications Clause and the Seventeenth Amendment, which specify that the qualifications for state and congressional elections should be the same. *See* U.S. CONST. art. I, § 2, cl. 1; *id.* amend. XVII. According to Secretary Kobach, this occurs because the injunction issued by the district court and the NVRA itself require that motor voter applicants without DPOC be registered for federal elections, s*ee* § 20503(a), whereas Kansas law of course requires applicants for state and local elections to present DPOC. Thus, some voters will be registered to vote in Kansas's federal elections but not its state and local elections.

This argument fails because the divergence in who is registered for purposes of Kansas's state and federal elections results not from a substantive distinction in the qualifications required to vote but from Kansas's choice to impose greater procedural burdens by demanding more information of applicants than federal law requires. In *EAC*, we interpreted *Inter Tribal* as holding that while the states have the final say over the

71

substantive qualifications required, Congress can preempt state procedures to enforce those substantive qualifications so long as doing so does not preclude the states from enforcing their qualifications. *EAC*, 772 F.3d at 1195. And, significantly, we construed *Inter Tribal* as holding that, while citizenship is indeed a substantive qualification, the state registration mechanisms, like DPOC, that are designed to enforce it are not substantive, but instead procedural. In this regard, we observed there:

> Even as the [*Inter Tribal*] Court reaffirmed that the United States has authority under the Elections Clause to set *procedural* requirements for registering to vote in federal elections (i.e. that documentary evidence of citizenship may not be required), it noted that individual states retain the power to set *substantive* voter qualifications (i.e., that voters be citizens).

*Id.*[23] Properly understood, then, citizenship is the substantive qualification, while attestation and DPOC are the procedural conditions for establishing that qualification for registration purposes. Consequently, the district court's order enjoining the use of the DPOC requirement in federal elections did not effect a difference in the substantive qualifications applicable in federal elections and Kansas state and local elections, only the procedures for enforcing that qualification.

This distinction between substantive voter qualifications and procedural requirements for registration also forecloses Secretary Kobach's argument (made under both the irreparable-harm and likelihood-of-success-on-the merits prongs) that

---

[23] "That federal authority to establish procedural rules can coexist with state authority to define substantive rights is familiar from other contexts, such as the federal rules of civil procedure." *EAC*, 772 F.3d at 1195 n.8.

registration itself—including a DPOC requirement—is a qualification to vote in Kansas. Although *Inter Tribal*, by its strict terms, refrained from addressing this argument, 133 S. Ct. at 2259 n.9 (noting that Arizona raised for the first time in its reply brief the theory that registration itself is the relevant qualification, not citizenship, but declining to address that theory), in *EAC* we read *Inter Tribal* as effectively pointing the way toward resolution of this question. There, we determined, in the shadow of *Inter Tribal*, that DPOC constitutes a procedural condition—not a substantive qualification. *See EAC*, 772 F.3d at 1195. Thus, under our precedent, Secretary Kobach is incorrect to contend that registration itself—and thus DPOC—is a qualification to vote.

Secretary Kobach's arguments under the Qualifications Clause fail for one final reason: his arguments regarding the extent of the states' power under the Qualifications Clause and its relationship with Congress's power under the Elections Clause mirror those of Justice Thomas's dissent in *Inter Tribal*. Like Justice Thomas, Secretary Kobach contends that this is essentially a case not about regulating voter registration for federal elections but about who is qualified to vote in federal elections. *Compare* Aplt.'s Opening Br. 45–46 ("If a state requires proof of citizenship prior to registration to be a qualified elector, then Article I, § 2, Cl. 1, and the Seventeenth Amendment command that the federal government must respect the State's decision and acknowledge that the same qualification applies to federal elections."), *with Inter Tribal*, 133 S. Ct. at 2269 (Thomas, J., dissenting) ("Arizona has the independent *constitutional* authority to verify citizenship in the way it deems necessary." (emphasis added)), *and id.* at 2269–70

73

("Given States' exclusive authority to set voter qualifications and to determine whether those qualifications are met, I would hold that Arizona may request whatever additional information it requires to verify voter eligibility."). But "[t]his is one of those instances in which the dissent clearly tells us what the law is not." *EAC*, 772 F.3d at 1188 (referring to Justice Thomas's dissent in *Inter Tribal*).

Under the rule we adopt today, Plaintiffs-Appellees have more than adequately shown a likelihood of success on the merits and Secretary Kobach's arguments to the contrary fail. The district court did not abuse its discretion or otherwise err in finding that Plaintiffs-Appellees met their burden to show a likelihood of success on the merits, even under the heightened standard for a disfavored preliminary injunction that we have assumed is applicable. Of course, we have only considered the record as it stands at this early stage of the proceedings. Further discovery will presumably ensue. If evidence comes to light that a substantial number of noncitizens have registered to vote in Kansas during a relevant time period, inquiry into whether DPOC is the minimum amount of information necessary for Kansas to carry out its eligibility-assessment and registration duties would then be appropriate. We now address the remaining prongs of the preliminary injunction analysis.

### D.    Threat of Irreparable Harm

To show a threat of irreparable harm, a plaintiff must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

74

Irreparable harm also occurs if "the district court cannot remedy [the injury] following a

final determination on the merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253

F.3d 1234, 1250 (10th Cir. 2001).[24]

---

[24]     The Plaintiffs-Appellees argue that under our precedent, particularly
*Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255 (10th Cir. 1981), no
showing of irreparable harm is necessary when "the defendants are engaged in, or about
to be engaged in, the act or practices prohibited by a statute which provides for injunctive
relief to prevent such violations," *id.* at 259.  But *Lennen* and our other decisions
following it (*Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 651–52 (10th Cir.
2004);  *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1035 (10th Cir.
1993)), must be read in light of the Supreme Court's decision in *Weinberger v. Romero-
Barcelo*, 456 U.S. 305 (1982) (postdating *Lennen*) and the line of cases that follow
*Romero-Barcelo*.  Those cases clarify the narrow circumstances when a presumption of
irreparable injury could apply stemming from a congressional enactment.

The Court held in *Romero-Barcelo* that courts should "not lightly assume that
Congress has intended to depart from established principles" of equity jurisprudence
simply because a federal statute specifies that courts have the power to dispense equitable
relief for statutory violations.  456 U.S. at 313 (reversing the First Circuit, which had held
that the district court had a duty under the relevant statute to issue an injunction).  Further,
the Court specified in *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987),
that applying a presumption of irreparable harm for violation of a federal statute, without
a proper textual basis in the statute, is a departure from traditional equitable principles.
*Id.* at 544–45 ("This presumption is contrary to traditional equitable principles and has no
basis in [the Alaska National Interest Lands Conservation Act].").  Following *Romero-
Barcelo*, we have held that only an "unequivocal statement" by Congress may modify the
courts' traditional equitable jurisdiction.  *Garcia v. Bd. of Educ.*, 520 F.3d 1116, 1129
(10th Cir. 2008).  Of course, a court's choice in weighing factors under such equitable
jurisdiction—*viz.*, in fashioning a remedy to enforce a congressional enactment—does not
extend to a choice regarding whether to enforce the statute at all.  *See United States v.
Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497–98 (2001) ("Their [i.e., district
courts acting in equity] choice (unless there is statutory language to the contrary) is
simply whether a particular means of enforcing the statute should be chosen over another
permissible means; their choice is not whether enforcement is preferable to no
enforcement at all.").

Here, there is no indication in the NVRA's text that Congress intended to constrain
or otherwise guide the traditional exercise of equitable jurisdiction in weighing whether

75

We have held that irreparable harm "does not readily lend itself to definition,"

*Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (quoting *Wis. Gas Co. v. Fed.*

*Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)), and is "not an easy

burden to fulfill," *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir.

2003). "The court's discretion is to be exercised in light of the purposes of the statute on

which plaintiff's suit is based." *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124

F.3d 1221, 1230 (10th Cir. 1997).

There can be no dispute that the right to vote is a constitutionally protected

fundamental right. *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("By denying

some citizens the right to vote, such laws deprive them of a 'fundamental political right, .

. . preservative of all rights.'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)));

an injunction should issue to remedy violations of the statute. The NVRA simply lays out time periods in which an aggrieved person may bring suit for either declaratory or injunctive relief. § 20510(b). In that sense, the NVRA is unlike section 10 of the Administrative Procedure Act, which requires that a "reviewing court *shall* . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706 (emphasis added); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999) ("In sum, we hold that Congress, through 5 U.S.C. § 706, has explicitly removed from the courts the traditional equity balancing that ordinarily attends decisions whether to issue injunctions."). Similarly, the NVRA is unlike the Endangered Species Act of 1973, which was at issue in *TVA v. Hill*, 437 U.S. 153 (1978). As the Court later explained, "That statute contains a flat ban on destruction of critical habitats of endangered species and it was conceded that completion of the dam would destroy the critical habitat of the snail darter. . . . Congress, it appeared to us, had chosen the snail darter over the dam. The purpose and language of the statute [not the bare fact of a statutory violation] limited the remedies available . . . [and] only an injunction could vindicate the objectives of the Act.'" *Amoco*, 480 U.S. at 543 n.9 (alteration in original) (quoting *Romero-Barcelo*, 456 U.S. at 314). The NVRA is far from approaching the specificity required to limit the courts' traditional equitable discretion. Accordingly, we apply our traditional abuse of discretion standard to the familiar four-pronged preliminary injunction analysis.

*accord Hellebust v. Brownback*, 42 F.3d 1331, 1333 (10th Cir. 1994). "When an alleged

constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quoting

11A Charles Allen Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed.

1995)). Accordingly, while we must nonetheless engage in our traditional equitable

inquiry as to the presence of irreparable harm in such a context, we remain cognizant that

the violation of a constitutional right must weigh heavily in that analysis. *Cf. Elrod v.

Burns*, 427 U.S. 347, 374 & n.29 (1976) (holding that "[t]he loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury[,]" while noting that this is so because "[t]he timeliness of political speech is

particularly important"). This is especially so in the context of the right to vote. Because

there can be no "do-over" or redress of a denial of the right to vote after an election,

denial of that right weighs heavily in determining whether plaintiffs would be irreparably

harmed absent an injunction. *League of Women Voters of N.C. v. North Carolina*, 769

F.3d 224, 247 (4th Cir. 2014); *accord Obama for Am. v. Husted.*, 697 F.3d 423, 436 (6th

Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

The district court did not legally err or otherwise abuse its discretion in finding

irreparable harm. The district court found that several of the named plaintiffs had

registered in 2013 or 2014 to vote in the 2014 elections and that they desired to vote in

the upcoming 2016 elections. Further, as of March 2016, 12,717 applications had been

cancelled since Kansas's DPOC requirement went into effect and another 5,655

applications were suspended as incomplete.  In other words, over 18,000 Kansans stood to lose the right to vote in the coming general elections—elections that are less than one month away.  The district court further found that the DPOC requirement has a chilling effect, discouraging otherwise qualified citizens, once rejected, from reapplying.  Taking these findings together, we determine that the court did not abuse its discretion in concluding that there was an almost certain risk that thousands of otherwise qualified Kansans would be unable to vote in November.  This denial of the right to vote constitutes a strong showing of irreparable harm, and one which cannot be compensated by money damages.

Against these findings of fact, Secretary Kobach makes two arguments.  First, he argues that the Plaintiffs-Appellees delayed at least thirty months in bringing their claims, and their delay forecloses a finding of irreparable harm.  Second, he argues that the plaintiffs' harm is self-inflicted and so cannot constitute irreparable harm.  We address each argument in turn.

As for delay, it is true that "delay in seeking preliminary relief cuts against finding irreparable injury."  *RoDa Drilling*, 552 F.3d at 1211 (quoting *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994)).  However, delay is only one factor to be considered among others, *id.*, and there is no categorical rule that delay bars the issuance of an injunction, *see id.* at 1210, 1211–12 ("We note that the Supreme Court has rejected the application of categorical rules in injunction cases.  . . . [D]elay is but one factor in the irreparable harm analysis . . . .").

78

The question instead is whether the delay was reasonable, was not a decision by the party to "sit on its rights," and did not prejudice the opposing party. *See id.* at 1211–12.

Here, Secretary Kobach points to delay as though it should conclusively defeat a preliminary injunction but fails to make any argument as to how the particular delay at issue here undercuts a finding of irreparable harm. He argues only the length of the delay and fails to show how that delay prejudiced him. This failure alone is sufficient for us to reject his delay rationale. *See Kan. Health Care Ass'n*, 31 F.3d at 1544 ("Finally, we agree with the district court that defendants have not claimed that they are somehow disadvantaged because of the delay. We therefore find no error or abuse of discretion in the district court's conclusion that plaintiffs established that they have or will suffer an irreparable harm, which is not undermined by their delay in commencing this action.").

Secretary Kobach next argues that Plaintiffs-Appellees' harm is self-inflicted because they could have complied with the DPOC requirement but simply chose not to do so. The district court made factual findings that cut against his self-inflicted harm contention, and they were not clearly erroneous. For instance, the court found that there was no evidence in the record to establish either Kansas's efforts to inform voters of the new requirements or that the named plaintiffs received the individual notices of failure to meet the DPOC requirements. The district court also found that the plaintiffs had established that they faced financial and administrative obstacles to obtaining DPOC. Further, the court found that the administrative hearing alternative to DPOC, Kan. Stat.

Ann. § 25-2309(m), was too burdensome and vague to serve as an effective safety valve—particularly given that only three voters had ever availed themselves of it.

Moreover, our cases show that typically a finding of self-inflicted harm results from either misconduct or something akin to entering a freely negotiated contractual arrangement, not from a failure to comply with an allegedly unlawful regime. For example, in *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002), we discerned self-inflicted harm because the defendant improperly entered "into contractual obligations that anticipated a pro forma result" from National Environmental Protection Act review. *Id.* at 1116; *see also Sierra Club v. Bostick*, 539 Fed. App'x 885, 893 (10th Cir. 2013) ("A close reading of *Davis* reveals that what led us to brand the state defendants' harm with the 'self-inflicted' label, and decline to weigh it, was the fact that the harm-inducing contractual conduct of those defendants . . . was predicated on the federal agency's improper actions, and the impropriety of those actions was attributable to the state defendants. . . . The state defendants expected a 'pro forma result' because they had been knowingly collaborating with the federal agency defendant while it improperly 'prejudged the NEPA issues.'"). Even the lone case cited by Secretary Kobach concerns harms caused by "the express terms of a contract [the plaintiff] negotiated," *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003), not harms caused by an allegedly unlawful state statute.

In short, the circumstances that breathe vitality into the doctrine of self-inflicted harm are not present here. Moreover, we reject the notion that the source of an injury is a

80

litigant's decision not to comply with an allegedly unlawful state regime, rather than the regime itself. *Cf. Meese v. Keene*, 481 U.S. 465, 475 (1987) (noting that "the need to take such affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury"). Were this notion to apply in a case like this one, a court could never enjoin enforcement of an unlawful statute if the plaintiffs could have complied with the statute but elected not to; this hypothetical scenario borders on the absurd.

In the end, our task is not de novo review. "[W]e need only evaluate whether the district court's remedial decision is within the range of reasonable choices." *Garcia v. Bd of Educ.*, 520 F.3d at 1129. Put succinctly, the NVRA's statutory purposes are to "enhance[] the participation of eligible citizens as voters in elections for Federal office" while protecting election integrity and the accuracy and currency of registration rolls. § 20501(b). In light of these purposes and the imminent disenfranchisement of over 18,000 Kansans, we conclude that there is no error or abuse of discretion in the district court's finding of irreparable harm.

## E. Balance of Equities

"We must next balance the irreparable harms we have identified against the harm to defendants if the preliminary injunction is granted." *Davis*, 302 F.3d at 1116. Again we review for abuse of discretion. We do not reject out of hand that the administrative burdens of compliance with the preliminary injunction are a real harm or conclude that the state has no legitimate interest in preventing even small numbers of noncitizens from voting. But the district court found that Secretary Kobach had shown only three cases of

81

noncitizens actually voting and that the administrative burden of altering the registration

status of the roughly 18,000 applicants in question was limited to a largely automated

process that would be neither unduly time consuming or costly.  The district court further

found that Kansas managed to cope with a bifurcated election in 2014.[25]  Most

importantly, however, the court found that the burden of a bifurcated system was of

Kansas's own creation because Kansas chose to pass and enforce a law that conflicts with

the NVRA and, thus, that law cannot apply to federal elections.

Furthermore, we reject as based on conjecture Secretary Kobach's invitation to

consider as "just the tip of the iceberg" the twenty-five cases in Sedgwick County of

aliens registering or attempting to register.  Aplt.'s Opening Br. 55.  The assertion that the

---

[25]  In the run-up to oral argument, the parties informed the court of ongoing litigation in the Kansas state courts concerning whether Kansas law prohibited Secretary Kobach from operating bifurcated registration and election systems.  A temporary injunction was issued in that case, which requires Secretary Kobach to count the votes of those registered for federal elections in *both* state and federal elections, *Brown v. Kobach*, Case No. 2016CV550 (Shawnee Cty. Dist. Ct. July 29, 2016).  Secretary Kobach informed us at oral argument, however, that a further hearing was to take place on this matter, but we have not received an update from either party as to further developments in that case.  Lacking further information, we proceed on the assumption that Kansas may still go forward with a bifurcated system.  We remind the parties that

> [i]t is the parties, not the court, who are positioned to remain abreast of external factors that may impact their case; this is of particular importance where, as here, those factors directly pertain to this court's substantive inquiry. We look to the parties to inform us of such developments, and we should be assured that they will do so diligently.

*Jordan v. Sosa*, 654 F.3d 1012, 1020 n.11 (10th Cir. 2011).

82

"number of aliens on the voter rolls is likely to be in the hundreds, if not thousands" is pure speculation. *Id.* at 56. The extent of the harm to Secretary Kobach by the issuance of the injunction consists of essentially two things: (1) light administrative burdens, and (2) any costs associated with the hindering of Kansas's choice to pursue a zero-instance policy regarding the registration of noncitizens.

On the other side of the equation is the near certainty that without the preliminary injunction over 18,000 U.S. citizens in Kansas will be disenfranchised for purposes of the 2016 federal elections—elections less than one month away. We cannot ignore the irreparable harm of this denial of the right to vote, particularly on such a large scale. There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by Secretary Kobach's office and other state and local offices involved in elections. Nor does the negligible risk that a few votes might be cast by noncitizens alter our equitable calculus—especially given the certainty of irreparable harm to the rights of so many citizens. We also reject Secretary Kobach's arguments that the Plaintiffs-Appellees suffer no harm, as he merely rehashes the arguments we addressed in the context of the irreparable harm analysis. Those arguments fail, and the district court did not abuse its discretion in finding that the balance of equities strongly favors the Plaintiffs-Appellees.

F.      **Whether an Injunction Is in the Public Interest**

"A movant also has the burden of demonstrating that the injunction, if issued, is not adverse to the public interest." *Heideman*, 348 F.3d at 1191. We note that our

83

"democratically elected representatives . . . are in a better position than this Court to determine the public interest[;] . . . [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest." *Id.* In *Romero-Barcelo*, the Supreme Court noted that although courts should exercise their traditional equitable practices in evaluating requests for injunctive relief for violation of a federal statute, those practices are "conditioned by the necessities of the public interest which Congress has sought to protect." 456 U.S. at 320.

There is no question that Kansas's interest in ensuring that not a single noncitizen (or an insubstantial number of them) should vote is in tension with the right to vote of over 18,000 Kansans. Kansas's interest is also in tension with the registration procedures that Congress required in the NVRA. Congress has spoken clearly by ensuring that whatever else the states do, "a simple means of registering to vote in federal elections will be available." *Inter Tribal*, 133 S. Ct. at 2255.[26] The registration requirements set forth by Congress in the NVRA—requirements designed to increase the number of eligible voters who register and vote—demonstrate Congress's determination that the public interest in the widespread exercise of the franchise trumps the narrower interest of ensuring that not a single noncitizen votes (or an insubstantial number of them). Indeed,

---

[26] Secretary Kobach argues that a bifurcated election will produce "great confusion for voters." Aplt.'s Opening Br. 59. However, Kansas's concerns about voter confusion thus ring hollow; the principal source of that confusion is Kansas's own voter-registration laws. As the district court found, "the record suggests that Kansas motor voters are already confused about the current DPOC law and how to meet its requirements." *Fish v. Kobach*, 2016 WL 2866195, at *29.

84

as the district court observed, exceedingly few noncitizens have been shown to have voted compared to the number of Kansans who stand to lose the right to vote in the coming elections. The public interest in broad exercise of the right to vote will be furthered rather than harmed by the district court's injunction.

### III. CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's grant of a preliminary injunction and **REMAND** the case for further proceedings not inconsistent with this opinion.